Nebraska Supreme Court Online Library
www.nebraska.gov/courts/epub/
02/05/2016 09:12 AM CST

SHELLEY JANE BROZEK, APPELLEE AND CROSS-APPELLANT, V.
KIRK STEVEN BROZEK, APPELLANT AND CROSS-APPELLEE.

___ N.W.2d ___

Filed February 5, 2016.    Nos. S-14-957, S-14-1141.

1. **Divorce: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge.
2. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
3. **Contracts: Statutes: Appeal and Error.** The construction of a contract and the meaning of a statute are questions of law which an appellate court reviews de novo.
4. **Contracts: Stock.** The general rules of contract construction apply to restrictive share agreements.
5. **Contracts.** If a contract's terms are clear, a court may not resort to the rules of construction and must give the terms their plain and ordinary meaning as a reasonable person would understand them.
6. ____. A court must consider a contract as a whole and, if possible, give effect to every part of the contract.
7. **Divorce: Property Division.** In a divorce action, the purpose of a property division is to distribute the marital assets equitably between the parties.
8. **Property Division.** Equitable property division is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties.
9. ____. The ultimate test in determining the appropriateness of a property division is fairness and reasonableness as determined by the facts of each case.

10. ____. Generally, the date on which a court values the marital estate should be rationally related to the property composing the marital estate.

11. **Divorce: Property Division.** Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate.

12. ____: ____. The marital estate does not include property that a spouse acquired before the marriage, or by gift or inheritance.

13. ____: ____. Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse.

14. **Property Division: Proof.** The party claiming that property is nonmarital has the burden of proving the property's separate status.

15. **Statutes.** A court gives statutory language its plain and ordinary meaning.

16. **Statutes: Legislature: Intent.** A court's duty in interpreting a statute is to determine and give effect to the Legislature's purpose as ascertained from the statute's entire language considered in its plain, ordinary, and popular sense.

17. **Divorce: Jurisdiction: Attorney Fees: Appeal and Error.** An order helping a party pay for his or her attorney's work on appeal is an order in aid of the appeal process under Neb. Rev. Stat. § 42-351(2) (Reissue 2008).

18. **Divorce: Alimony.** In considering alimony, a court should weigh four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the party seeking support to engage in gainful employment without interfering with the interests of any minor children in the custody of each party.

19. ____: ____. In addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2008), a court should consider the income and earning capacity of each party and the general equities before deciding whether to award alimony.

20. **Divorce: Property Division: Alimony.** The statutory criteria for dividing property and awarding alimony overlap, but the two serve different purposes and courts should consider them separately.

21. **Divorce: Alimony.** In weighing a request for alimony, the court may take into account all of the property owned by the parties when entering the decree, whether accumulated by their joint efforts or acquired by inheritance.

22. **Divorce: Attorney Fees.** A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases.

23. \_\_\_\_: \_\_\_\_. A dissolution court deciding whether to award attorney fees should consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services.

Appeals from the District Court for Antelope County: Mark A. Johnson, Judge. Affirmed.

David A. Domina and Christopher A. Mihalo, of Domina Law Group, P.C., L.L.O., for appellant.

Russell A. Westerhold, of Fraser Stryker, P.C., L.L.O., for appellee.

Heavican, C.J., Connolly, Miller-Lerman, Cassel, and Stacy, JJ.

Connolly, J.

## I. SUMMARY

Shelley Jane Brozek and Kirk Steven Brozek separated, and the court later dissolved their marriage of about 20 years. The decree divided the marital estate and ordered Kirk to buy some of Shelley's separate property. Kirk appeals, and Shelley cross-appeals. Kirk argues that the court erred by ordering him to buy Shelley's shares in a closely held farming corporation for an amount higher than the value determined under a stock redemption agreement. He also argues that the court erred in dividing the marital estate, that it should have given him a credit for premarital property he disposed of during the marriage, and that it lacked jurisdiction to award Shelley attorney fees after he filed a notice of appeal. Shelley argues that the court should have awarded her alimony, a cash award for the inadequacy of the marital estate, and attorney fees. We affirm the decree and the order awarding Shelley attorney fees.

## II. BACKGROUND

### 1. Parties' Work History

Shelley and Kirk married in October 1993. They have two daughters, and Kirk adopted Shelley's son from a prior marriage. The parties separated on December 24, 2011, after more than 18 years together.

A month later, Shelley filed a dissolution complaint. When the court tried the case in April 2014, Shelley was 50 and Kirk was 47 years of age. Only one of their children was still a minor.

Kirk has farmed since he graduated from college in 1986. He farms with his father, brother, and adopted son.

Before Shelley married Kirk, she worked as a grocery clerk and secretary, and she also worked in sales. She did not pursue education beyond high school and testified that her marriage to Kirk did not interrupt her education or career.

Shelley stated she and Kirk were in "total agreement" that she would not work outside the home. She maintained the marital home, brought meals and equipment parts to the field, mowed and sprayed pasture, and helped put up hay on a few small tracts. Kirk's brother, though, testified that Shelley seldom helped with the farming operation and "was mostly in the way."

### 2. The Corporations

Kirk's farming is interwoven with two closely held corporations. The first, Brozek & Sons, Inc., is "the operating entity of the farming operation." It owns the land, sells the grain, and pays the Brozeks and others for their services. Its largest asset is about 3,400 acres of land. Kirk and his brother personally rent some of Brozek & Sons' land, but the corporation "also operate[s] some of its own ground."

The other corporation is Brozek Farms, Inc., which is "principally an equipment company." It leases the equipment it owns to Brozek & Sons.

Kirk and Shelley are shareholders of both Brozek & Sons and Brozek Farms. Kirk's parents gifted him shares of Brozek

& Sons before and during the marriage. Shelley testified that she received her shares by gift during the marriage. Kirk has 75,541.67 shares, and Shelley has 12,000 shares of Brozek & Sons, comprising stakes of about 21 percent and 3 percent, respectively. Kirk has 437.5 shares, and Shelley has 62.5 shares of Brozek Farms.

Kirk, Shelley, and the other shareholders of Brozek & Sons signed a "Redemption Agreement" in 2003. The agreement states that no sale, assignment, or other disposition of Brozek & Sons shares is valid unless made under the agreement.

At trial, the parties disputed the meaning of two paragraphs of the agreement. The second paragraph provides:

> Transfer to Related Stockholder. Anything in this agreement to the contrary notwithstanding, a Stockholder may at any time or from time to time transfer all or any part of his stock to his spouse, one or more of his children, or a trustee or custodian for the exclusive benefit of himself, his spouse, or his issue . . . .

The third paragraph provides: "Sale During Life. A Stockholder desiring, during his lifetime, to sell or otherwise encumber his stock shall make a written offer to sell to [Brozek & Sons] upon the following terms and conditions, and [Brozek & Sons] shall purchase all of such shares of stock . . . ." The original price was $8.50 per share, but Kirk testified that the Brozek & Sons board increased it to $12 in 2013.

Shelley testified that she did not want to remain a shareholder of either Brozek & Sons or Brozek Farms because "I don't think that would be reasonable." Kirk testified that he did not want to purchase Shelley's Brozek & Sons shares for a price above the value determined under the redemption agreement.

In contrast to Brozek & Sons, there is no redemption agreement for Brozek Farms. Kirk testified that he was willing to buy Shelley's Brozek Farms shares at a price determined by the court.

Kirk and Shelley hired experts to appraise their Brozek & Sons and Brozek Farms shares using a net asset approach.

Shelley's expert valued a minority share of Brozek & Sons at $50 in August 2011 and August 2012. He valued a minority share of Brozek Farms at $341 in August 2011 and $290 in August 2012. As of December 24, 2011, Kirk's expert valued Shelley's Brozek & Sons shares at about $34 each and her Brozek Farms shares at about $270 each. Shelley's expert reviewed the reports of Kirk's expert and testified that the main differences were the valuation dates and the discounts for lack of control and marketability.

### 3. Disputed Personal Property

Because Brozek & Sons held the land, Kirk and Shelley did not own any real estate. But they did accumulate significant personal property during the marriage, including several horses. Shelley could not remember how many horses she and Kirk had when they separated, but she thought there might have been six. She did not possess any of the horses at the time of trial because her current residence lacked facilities.

In Kirk's "Statement of Financial Condition" as of December 31, 2011, he said that he had "Horses 7 head" but named only six animals. In a "2011 Depreciation and Amortization Report," Kirk included a "Horse/MH" in addition to the six horses he named in his "Statement of Financial Condition." Kirk had taken depreciation on all of the horses except one.

Kirk valued the horses at $12,600. Shelley suggested that the court include half of the horses' value in the marital estate and award the horses to Kirk.

The parties acquired a horse trailer during their marriage. Shelley possessed the trailer at the time of trial but did not want it because she did not have any horses. Kirk stated that he did not want the trailer.

Shelley and Kirk also bought automobiles during their marriage, including a 2004 Ford pickup truck. Kirk was driving the truck when he and Shelley separated but said that their adult daughter was driving it at the time of trial. Shelley testified that their adult daughter drove, but did not own, the truck,

which was "part of the whole package of vehicles that Kirk and I own."

## 4. KIRK'S PREMARITAL PROPERTY

Kirk attempted to identify and trace a significant amount of premarital personal property. For items that he no longer had at his separation from Shelley, Kirk asked for a "credit or set-off" against the marital estate.

Kirk's alleged premarital property included two checking accounts. He used one for household use and the other for farm use. Kirk said that the farm account had about $79,000 when he married Shelley. He added Shelley's name to both accounts after their marriage, and they used the accounts until they separated.

For the premarital machinery that he had sold or traded in, Kirk wanted a credit against the marital estate. He submitted evidence of the purchase price of the machinery, which he said was evidence of its "value" because his equipment held its value as it aged or even appreciated. But he acknowledged that farm equipment generally depreciates.

The premarital machinery that Kirk no longer possessed included two tractors, a disk, a cultivator, a fertilizer spreader, and a drill. Kirk testified that he sold or traded in each of these items at some point but could not remember what consideration he received. He remembered using the trade-in value of a premarital shredder and an unspecified amount of "cash boot" to acquire a different shredder in 2011. Asked what the trade-in value for the shredder was, Kirk took "a guess that my memory is $3,500." He said he kept "unique files for each unique item of equipment," but files matching that description are not in the record.

Finally, Kirk wanted a "bushel for bushel set-off," or at least a credit, for the crops he harvested in 1993. He said he farmed a particular number of acres of corn, popcorn, and soybeans in 1993. Using an "average [yield] of the area of the other fields in the area," he estimated how many bushels he harvested, and

valued them at $190,000. Kirk used the proceeds of his 1993 harvest to "reinvest[] my cash fund, and inventory of grain to fund the next years crop" and "rolled such investments, year to year, from 1993 through December 24, 2011."

### 5. Parties' Income and Their Postseparation Circumstances

Most of Shelley and Kirk's income came from Kirk's personal farming activities and the salaries he drew from Brozek & Sons and Brozek Farms. According to Kirk's W-2 wage and tax statements, he received combined wages from Brozek & Sons and Brozek Farms of $31,800 in 2008, $33,600 in 2009, and $33,600 in 2010. Brozek & Sons also paid the family's health insurance premiums, telephone bills, Internet bills, and fuel costs. Brozek & Sons also let Kirk and Shelley live rent free in a house owned by the corporation. Kirk said his annual net farm income with straight-line depreciation was about $35,600 in 2008; $124,000 in 2009; and $77,400 in 2010.

After their separation, Kirk continued to farm and Shelley's pursuits varied. She found employment with a large hog producer caring for "reject pigs" that had "something wrong with them." Once the pigs put on weight, Shelley and the producer sold them and split any profits.

Shelley also sold a few steers from her cattle herd. She took about 24 cows and 17 calves with her when she left the marital home in December 2011. Shelley had maintained the herd but could not grow it because of financial constraints. Her hope was to support herself by growing the herd, but she needed more pasture.

Outside of her livestock operation, Shelley has done some "odd jobs" for friends. She thought that the only other jobs available to her in the area were those paying around minimum wage. She estimated that her living expenses were $5,160 per month.

According to her separately filed federal tax returns, Shelley had a total income of about $17,200 in 2012 and $17,600 in

2013. According to Kirk's federal tax return, he lost $13,000 in 2012.

## 6. Decree

In September 2014, the court entered its operative decree dissolving the parties' marriage. It determined that Kirk and Shelley's Brozek & Sons and Brozek Farms shares were their separate property. But Kirk should nevertheless buy Shelley's shares in both corporations because leaving them in Shelley's hands "would be impractical and lead to an inequitable result."

The court valued Shelley's Brozek & Sons shares at $50 each and her Brozek Farms shares at $315.50 each. It stated that the appraisals of Shelley's expert reflected the "current market value closest to the date of trial" and were more persuasive than the opinions of Kirk's expert.

The court ordered Kirk to pay Shelley $600,000 for her 12,000 shares of Brozek & Sons and $19,718.75 for her 62.5 shares of Brozek Farms. And, on the issue that has largely driven this appeal, it found that the redemption agreement did not apply to Kirk's purchase of the Brozek & Sons shares because the agreement, by its terms, did not apply to transfers between spouses.

The court rejected Kirk's attempts to trace his premarital property. Regarding the checking accounts, it stated that the funds "have been so commingled that it is not practicable to attempt to separate them to any logical end." Similarly, giving Kirk a credit for the value of the premarital machinery that he traded in during the marriage would require speculation. Nor was Kirk entitled to a "grain-for-grain credit" for his 1993 harvest. He only estimated the number of bushels he actually harvested. Plus, the court was not persuaded that "after nearly 20 years of marriage the [market] value of the grain was not completely commingled in the years that farming operations were not as profitable as when they were more so."

The court valued the parties' net marital estate at about $2.5 million, nearly $2.4 million of which it awarded to Kirk.

The most substantial items were about $1.2 million of crops held in storage in December 2011 and $485,000 of machinery. The court determined that funds in both the household and farm checking accounts on December 23 and 24, 2011, were marital property. It awarded Kirk the 2004 Ford pickup, the horse trailer, and "7 head of horses valued at $6,300." It awarded Shelley 36 head of cattle valued at about $40,000. To equalize the marital estate, the court ordered Kirk to pay Shelley about $1.1 million.

Shelley argued that she should receive additional compensation because the corporate ownership of farming assets made the marital estate inadequate. The court referred to Shelley's request as one for a "*Grace* award" under our decision in *Grace v. Grace*.[1] The court declined Shelley's invitation, emphasizing that the marital estate was substantial and that Kirk's average income from 2009 to 2011 was $96,000. Furthermore, Shelley would be compensated for the effort she and Kirk put into the Brozek family corporations through the forced sale of her shares to Kirk for about $620,000.

The court similarly denied Shelley's request for $3,000 per month of alimony for 10 years. It acknowledged "a great disparity in incomes of the parties." But it concluded that the marriage had not interrupted Shelley's career or educational pursuits and that she would not have to delay any such pursuits to care for the children, the youngest of which was nearly the age of majority. Plus, the court noted that Shelley would receive cash for her shares in the Brozek corporations and a large equalization payment: "This will, as a natural consequence, reduce [Kirk's] earning capacity and likewise increase [Shelley's] earning capacity due to access to over **$1,887,984.00** in cash or assets for investment in her cattle herd or otherwise."

The court ordered each party to pay their own attorney fees and costs.

---

[1] *Grace v. Grace*, 221 Neb. 695, 380 N.W.2d 280 (1986).

In October 2014, Kirk filed his notice of appeal. About 2 weeks later, Shelley filed a "Motion for Temporary Relief Pending Appeal." Because she had not paid any of her attorney fees yet, she asked for "a reasonable amount of attorneys' fees to allow for her defense of [Kirk's] appeal." The court sustained Shelley's motion and awarded her $10,000 of "[t]emporary attorney fees."

Kirk filed a notice of appeal from the court's order on Shelley's motion for temporary relief. We sustained his motion to consolidate the two appeals for briefing and disposition.

## III. ASSIGNMENTS OF ERROR

Kirk assigns, restated, that the court erred by (1) ordering him to buy Shelley's Brozek & Sons shares at a price contrary to the redemption agreement; (2) not valuing Shelley's Brozek & Sons and Brozek Farms shares as of the date of the parties' separation; (3) awarding him the horse trailer, the 2004 Ford pickup, and the horses; (4) not giving him a credit against the marital estate for the value of his premarital checking accounts, machinery, and crops; and (5) awarding Shelley attorney fees after he appealed from the decree.

On cross-appeal, Shelley assigns that the court erred by not awarding her (1) alimony, (2) a *Grace* award, and (3) attorney fees in the decree.

## IV. STANDARD OF REVIEW

[1,2] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge.[2] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[3]

---

[2] See *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015).

[3] *Id.*

[3] The construction of a contract and the meaning of a statute are questions of law which an appellate court reviews de novo.[4]

## V. ANALYSIS

### 1. KIRK'S APPEALS

#### (a) Redemption Agreement

Kirk argues that the redemption agreement should control the price he pays for Shelley's Brozek & Sons shares. The third paragraph of the agreement provides that shareholders who wish to sell their shares must offer them to the corporation at a price determined under the agreement. At the time of trial, that price was $12 per share. But the court decided that the repurchase provision in the third paragraph did not apply, because a sale between Kirk and Shelley was a transfer to a related stockholder under the second paragraph of the agreement.

Stock transfer restrictions, such as redemption agreements, are generally enforceable under Nebraska law.[5] A transfer of shares contrary to a restrictive agreement is voidable in equity.[6] But we have not yet considered redemption agreements in a marital dissolution action.

When dividing marital property, most courts do not treat a redemption agreement as conclusive evidence of a share's value.[7] Instead, a majority consider the price in the agreement

---

[4] See, *Cain v. Custer Cty. Bd. of Equal.*, 291 Neb. 730, 868 N.W.2d 334 (2015); *Labenz v. Labenz*, 291 Neb. 455, 866 N.W.2d 88 (2015).

[5] See, *Pennfield Oil Co. v. Winstrom*, 272 Neb. 219, 720 N.W.2d 886 (2006); *F.H.T., Inc. v. Feurhelm*, 211 Neb. 860, 320 N.W.2d 772 (1982); *Elson v. Schmidt*, 140 Neb. 646, 1 N.W.2d 314 (1941); 18 C.J.S. *Corporations* § 260 (2007).

[6] See *Pennfield Oil Co. v. Winstrom, supra* note 5.

[7] See 2 Brett R. Turner, Equitable Distribution of Property § 7:19 (3d ed. 2005). See, also, 1 Barth H. Goldberg, Valuation of Divorce Assets § 6:4 (rev. ed. 2005 & Cum. Supp. 2015-16); 2 Arnold H. Rutkin, Valuation and Distribution of Marital Property § 22.08[3][c] (2006).

as merely evidence of value.[8] A few jurisdictions presume that the agreed-upon price is correct,[9] and a minority hold that a redemption agreement is controlling as a matter of law.[10]

But we need not decide how a redemption agreement would apply in this circumstance if the redemption agreement does not, by its terms, actually apply to the facts of this case. As the court noted, the mandatory redemption provision in the third paragraph of the agreement is preceded by an exception in the second paragraph for transfers between related shareholders: "Anything in this agreement to the contrary notwithstanding, a Stockholder may at any time or from time to time transfer all or any part of his stock to his spouse . . . ." The court reasoned that Kirk and Shelley were still spouses, so it could order Kirk to buy Shelley's shares under the second paragraph notwithstanding the redemption provision in the third paragraph.

[4-6] The general rules of contract construction apply to restrictive share agreements.[11] If a contract's terms are clear, a court may not resort to the rules of construction and must give the terms their plain and ordinary meaning as a reasonable person would understand them.[12] A court must consider a contract as a whole and, if possible, give effect to every part of the contract.[13]

We agree with the trial court that Kirk could buy Shelley's shares notwithstanding the redemption provision in the third paragraph of the agreement. The second paragraph states that shareholders can "transfer" their shares to their spouse "[a]nything in this agreement to the contrary notwithstanding."

---

[8] See, e.g., *Barton v. Barton*, 281 Ga. 565, 639 S.E.2d 481 (2007).

[9] See, e.g., *In re Marriage of DeCosse*, 282 Mont. 212, 936 P.2d 821 (1997).

[10] See, e.g., *Mocnik v. Mocnik*, 838 P.2d 500 (Okla. 1992). See, also, 2 Turner, *supra* note 7.

[11] See 18 C.J.S., *supra* note 5, § 253.

[12] See *Kercher v. Board of Regents*, 290 Neb. 428, 860 N.W.2d 398 (2015).

[13] See *id.*

And a transfer is "[a]ny mode of disposing of or parting with an asset or an interest in an asset, including . . . the payment of money . . . ."[14] A sale of property (voluntary or not) is a transfer of the property.[15] Kirk was Shelley's spouse, so under the second paragraph of the agreement, the court could order him to buy Shelley's shares for $50 each, notwithstanding the buy-back provision in the third paragraph.

We note that Kirk, Shelley, and the court all agreed that Shelley's Brozek & Sons shares were her separate property. Generally, a dissolution court should award separate property to the spouse who owns it, and any other division of the nonmarital property is suspect.[16] But Kirk does not argue that the court lacked the power to order him to buy Shelley's Brozek & Sons shares because they were nonmarital. Instead, he complains that the court required him to pay too much for them. So we need not consider in what circumstances a court may order one spouse to buy another spouse's separate property.[17]

### (b) Value and Division of Marital Property

Kirk argues that the court "misvalued" and "misallocated" a horse trailer, horses, and a 2004 Dodge pickup truck that the parties acquired during the marriage.[18] The court determined that these assets were marital and awarded them to Kirk. He contends that the court overvalued the horses because all but three of them "belong to" or are "owned by" the parties'

---

[14] Black's Law Dictionary 1727 (10th ed. 2014).

[15] See, *id.* at 1537; Webster's Third New International Dictionary of the English Language, Unabridged 2003 (1993). See, also, 11 Samuel Williston, A Treatise on the Law of Contracts § 30:10 (Richard A. Lord ed., 4th ed. 2012).

[16] See 2 Turner, *supra* note 7, § 8:33.

[17] See *In re Claims Against Pierce Elevator*, 291 Neb. 798, 868 N.W.2d 781 (2015).

[18] Brief for appellant at 17.

daughters.[19] He argues the court should have awarded the horse trailer to Shelley because she wanted it and he did not. And he argues that the court should not have awarded him the entire value of the 2004 Ford pickup truck because their adult daughter drove the truck.

[7-9] In a divorce action, the purpose of a property division is to distribute the marital assets equitably between the parties.[20] Equitable property division is a three-step process.[21] The first step is to classify the parties' property as marital or nonmarital.[22] The second step is to value the marital assets and marital liabilities of the parties.[23] The third step is to calculate and divide the net marital estate between the parties.[24] The ultimate test in determining the appropriateness of a property division is fairness and reasonableness as determined by the facts of each case.[25]

We conclude that the court did not abuse its discretion by distributing the horse trailer, horses, and pickup truck to Kirk. The court had a good reason for not awarding the horse trailer to Shelley: she did not have any horses. Contrary to Kirk's argument, Shelley did not ask the court to award her the horse trailer. She testified that she did not have much use for a horse trailer but that "[i]f the Court feels that I need that trailer, then so be it."

The court did not err by awarding the horses to Kirk, because Shelley lacked the facilities to keep them. Nor did the court abuse its discretion by assigning the horses a value of $6,300. The court evidently accepted Shelley's suggestion to include half of the horses' value—$12,600 according to

---

[19] *Id.* at 31.

[20] *Tyma v. Tyma*, 263 Neb. 873, 644 N.W.2d 139 (2002).

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

Kirk—in the marital estate and award the horses to Kirk. Kirk argues that the decree, which included "7 head of horses" in the marital estate, "awards more horses than exist."[26] Asked how many horses she and Kirk had when they separated, Shelley testified, "Six, maybe, or something. I don't know." But Kirk said in his December 2011 "Statement of Financial Condition" that he had "Horses 7 head," and his "2011 Depreciation and Amortization Report" seems to list seven different horses. So the record supports the court's finding that the parties had seven horses.

Finally, the court did not abuse its discretion by including the 2004 Ford pickup truck in the marital estate and awarding it to Kirk. Kirk does not dispute that he and Shelley bought the truck during the marriage with marital funds. And he testified that he was driving the truck when he and Shelley separated. Even if the parties were allowing their adult daughter to drive the truck at the time of trial, she was not the owner. So this fact did not oblige the court to "neutralize[]" the truck for equitable distribution purposes.[27]

### (c) Valuation Date

Kirk argues that the court should have used the separation date instead of the trial date to value "the assets."[28] He states that he and Shelley "stayed away from one another" after December 24, 2011, and suggests that "[t]he assets are not more related to the trial date than the separation date."[29]

[10] Generally, the date on which a court values the marital estate should be rationally related to the property composing the marital estate.[30] But as Shelley notes, the court actually valued much of the marital property on the separation date. For

---

[26] Brief for appellant at 31.

[27] *Id.* at 32.

[28] *Id.* at 23.

[29] *Id.* at 22, 24.

[30] *Blaine v. Blaine*, 275 Neb. 87, 744 N.W.2d 444 (2008).

example, the court valued the household and farm checking accounts as of December 23 and 24, 2011. The values that the court used for automobiles, trailers, cattle, snowmobiles, and other personal property match those in Shelley's "Marital Balance Sheet" and Kirk's "Statement of Financial Condition," which are dated December 24 and 31, 2011. An exception is the parties' farm equipment, for which the court accepted the values from an appraisal dated December 12, 2012. But Kirk put that appraisal in evidence, so he can hardly complain about the court's using it.

Kirk's main complaint is that the court should have used his appraisal of Shelley's corporate shares, which valued them on the date of separation. The court found Shelley's appraisals more persuasive, in part, because they were "reflective of the current market value closest to date of trial." The shares were Shelley's nonmarital property, and we are not aware of any authority requiring a court to value nonmarital corporate shares as of the date when the acrimony between two shareholders reached a boiling point. Shelley's expert testified that appraisers generally prefer the most recent information because the value of a corporation's assets can fluctuate. Kirk counters that a "price-spike" occurred between the dates of separation and trial which, in hindsight, proved to be "a short-term artificial run-up in land values."[31] Even if Kirk is correct, the court had no way of knowing what the future held.

### (d) Tracing of Premarital Assets

Kirk argues that the court should have given him a credit against the marital estate for the value of some of his premarital property. In his brief, he reproduces a list of about 30 assets copied from his "Statement of Financial Condition" and asserts that "[t]hese are the nonmarital assets."[32] The court

---

[31] Brief for appellant at 23, 25.

[32] *Id.* at 28.

decided that some of these assets were Kirk's nonmarital property. And, for the retirement accounts, the court awarded Kirk a portion of their value that is substantially higher than the value that Kirk claims in his brief. He specifically argues that the court should have given him a credit for the value of (1) the premarital portion of the farm checking account, (2) the crops from his 1993 harvest, and (3) the machinery he owned at the time of his marriage. We restrict our review to those issues.[33]

[11-14] Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate.[34] Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance.[35] Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists.[36] Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse.[37] If the separate property remains segregated or is traceable into its product, commingling does not occur.[38] The burden of proof rests with the party claiming that property is nonmarital.[39]

After reviewing the record, we conclude that Kirk did not trace the value of the premarital funds in the farm checking account, the crops from his 1993 harvest, or the premarital machinery. He cites an armful of exhibits and concludes that "[t]he evidence is of direct, concrete documents that

---

[33] See *In re Claims Against Pierce Elevator, supra* note 17.

[34] *Coufal v. Coufal, supra* note 2.

[35] See, *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006); *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004).

[36] See, *Rezac v. Rezac*, 221 Neb. 516, 378 N.W.2d 196 (1985); *Charron v. Charron*, 16 Neb. App. 724, 751 N.W.2d 645 (2008).

[37] *Coufal v. Coufal, supra* note 2.

[38] *Id.*

[39] See *Gangwish v. Gangwish, supra* note 35.

substantiate the values."[40] But he does not identify the different permutations that his premarital property underwent during the marriage. And, after reviewing the evidence, we cannot follow the threads in the hodgepodge of figures.

For the farm checking account, Kirk presented evidence of its value before the marriage and its value on the separation date. Between those two points, Shelley became an account holder and Kirk made an unknown number of deposits and withdrawals. Kirk did not present any evidence of the withdrawal amounts during the marriage. Without any evidence of what withdrawals the parties made during the marriage, "the overwhelming likelihood is that tracing of withdrawals is not possible."[41]

Similarly, Kirk did not show what form his 1993 crops had taken by the time he and Shelley separated. He said that he "rolled" the proceeds of his 1993 harvest into the next years' crop, a process which he repeated each year through 2011. The proceeds of the 1993 harvest were therefore mixed with the proceeds of marital harvests and subject to the vicissitudes of the farming economy for nearly 20 years. Besides, Kirk could not show the number of bushels he actually harvested in 1993. He instead relied on an estimate using average yields for the area.

For his premarital machinery, Kirk argues that we should require less specificity because "tracing the value of continuously traded-in equipment would be futile."[42] He analogizes his farm machinery to the cattle herd which the Nebraska Court of Appeals treated as a single asset in *Shafer v. Shafer*.[43] There, the husband brought into the marriage 116 head of cattle worth about $60,000. By the time of trial, the herd

---

[40] Brief for appellant at 31.

[41] See 1 Brett R. Turner, Equitable Distribution of Property § 6:52 at 637 (3d ed. 2005).

[42] Brief for appellant at 30-31.

[43] *Shafer v. Shafer*, 16 Neb. App. 170, 741 N.W.2d 173 (2007).

was 166 head worth about $120,000. The husband testified that he continuously replaced the livestock as he sold them and that the herd gradually grew throughout the marriage, except for a brief period of drought. The husband sought a "set-aside" against the marital estate for the value of his premarital cattle.[44]

The Court of Appeals "view[ed] the cattle herd as in effect a single asset—rather than taking a 'cow by cow' approach."[45] The husband had sold his premarital cows, but the herd itself persisted through the roughly 13-year marriage:

> while an individual cow which [the husband] owned in 1991 was long ago turned into hamburger, hot dogs, and shoe leather and thus is not traceable, the cattle herd itself, which has always been part of [the husband's] farming operation, is in fact traceable. To do otherwise seems to us to exalt form over substance and ignore the equitable nature of a dissolution action.[46]

The Court of Appeals decided that the trial court should have given the husband a $60,000 credit against the marital estate for the premarital portion of the herd.

We conclude that Kirk's premarital machinery is distinguishable from the cattle herd in *Shafer*. A cow-and-calf herd is often a self-sustaining body: it produces calves each year, about half of which are heifers that eventually have calves of their own. The same cannot be said about farm equipment. The coupling of a tractor and grain cart will not produce a lawnmower next spring.

Ideally, to trace the value of an item of premarital machinery that Kirk traded in during the marriage, we would have evidence of the ratio of marital-to-nonmarital funds he used to acquire the new asset.[47] With one exception, Kirk testified

---

[44] *Id.* at 177, 741 N.W.2d at 178.

[45] *Id.* at 178, 741 N.W.2d at 179.

[46] *Id.*

[47] See 1 Turner, *supra* note 41, § 5:61.

that he did not know what consideration he received for selling or trading in his premarital machinery. He was able to "guess" he received $3,500 for a premarital shredder which he applied toward the purchase price of a new shredder. A spouse can establish a "tracing link" through his own testimony,[48] but the court was entitled to discount Kirk's testimony about the shredder because of his admitted uncertainty.

To summarize, as the spouse claiming a credit for nonmarital property, Kirk had the burden to show what portion of the parties' machinery was attributable to his premarital assets. Kirk did not meet his burden. We are aware that, in *Bussell v. Bussell*,[49] the Court of Appeals applied its reasoning from *Shafer* to premarital farm equipment exchanged for different farm equipment during the marriage. But we do not know what evidence the record contained in *Bussell*. To the extent that *Bussell* is inconsistent with this opinion, we disapprove of it.

(e) Postappeal Attorney Fees

Kirk argues that the court lacked jurisdiction to award Shelley $10,000 of attorney fees after he filed a notice of appeal from the decree. Shelley contends that the court retained jurisdiction to award her attorney fees for her lawyer's anticipated work on appeal.

Generally, a trial court loses jurisdiction once a party appeals.[50] But Neb. Rev. Stat. § 42-351(2) (Reissue 2008) creates several exceptions in dissolution cases:

> When final orders relating to [domestic relations actions] are on appeal and such appeal is pending, the court that issued such orders shall retain jurisdiction to provide for such orders regarding support, custody, parenting time, visitation, or other access, orders shown to be necessary

---

[48] *Id.*, § 5:63 at 639.

[49] *Bussell v. Bussell*, 21 Neb. App. 280, 837 N.W.2d 840 (2013).

[50] See *Spady v. Spady*, 284 Neb. 885, 824 N.W.2d 366 (2012).

to allow the use of property or to prevent the irreparable harm to or loss of property during the pendency of such appeal, *or other appropriate orders in aid of the appeal process*. Such orders shall not be construed to prejudice any party on appeal.

(Emphasis supplied.) Shelley argues that an award to help pay for her attorney's work on appeal was an "appropriate order[] in aid of the appeal process" under § 42-351(2).

[15,16] We give statutory language its plain and ordinary meaning.[51] Our duty is to determine and give effect to the Legislature's purpose as ascertained from the statute's entire language considered in its plain, ordinary, and popular sense.[52]

[17] We conclude that an order helping a party pay for his or her attorney's work on appeal is an "order[] in aid of the appeal process." The court therefore had jurisdiction under § 42-351(2) to award Shelley attorney fees after Kirk appealed from the decree. Nor can we say that the amount of the award was an abuse of discretion. The issues raised by the parties below warranted an assumption that the appellate work would be substantial.

## 2. Shelley's Cross-Appeals

### (a) Alimony

[18,19] Shelley argues that the court abused its discretion by not awarding her alimony. In considering alimony, a court should weigh four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the party seeking support to engage in gainful employment without interfering with the interests of any minor children in the custody of each party.[53] In addition to the specific criteria listed in Neb.

---

[51] *Pettit v. Nebraska Dept. of Corr. Servs.*, 291 Neb. 513, 867 N.W.2d 553 (2015).

[52] See *id.*

[53] See *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015).

Rev. Stat. § 42-365 (Reissue 2008), a court should consider the income and earning capacity of each party and the general equities.[54]

[20] The statutory criteria for dividing property and awarding alimony overlap, but the two serve different purposes and courts should consider them separately.[55] The purpose of a property division is to distribute the marital assets equitably between the parties.[56] The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in § 42-365 make it appropriate.

Shelley emphasizes that she was married to Kirk for 18 years before they separated and that his income far exceeds hers. She contributed to the marriage by raising the children and doing the "things that a typical Nebraska farm wife does on a day to day basis."[57] Her goal is to support herself by growing her cattle herd, and she estimated that it might take 10 years for her to do so. She suggests that alimony of $3,000 per month for 10 years would be reasonable.

[21] We conclude that the court did not abuse its discretion by declining to award Shelley alimony. The length of the marriage and disparity of incomes favors an award. But the marriage did not interrupt Shelley's career or education, and she will not have any childcare duties to hamper her career or educational pursuits after the marriage. At the time of trial, she planned to support herself by growing her cattle herd. The main obstacle to increasing her stock was Shelley's lack of capital, so the court was justified in considering the substantial amount of money that she will receive from Kirk's purchase of her corporate shares and the payment to equalize the

---

[54] See *id.*

[55] § 42-365.

[56] *Id.*

[57] Brief for appellee on cross-appeal at 32.

division of the marital estate. Shelley notes that the division of the marital estate and the award of alimony are separate inquiries under § 42-365. But that does not mean that a party's resources are irrelevant to her need for alimony. In weighing a request for alimony, the court may take into account all of the property owned by the parties when entering the decree, whether accumulated by their joint efforts or acquired by inheritance.[58]

(b) "*Grace* Award"

Shelley argues that the court should have given her additional compensation for the inadequacy of the marital estate. She emphasizes that Kirk received a small salary relative to Brozek & Sons' revenue and that the marital estate would have been larger if Kirk had received a higher salary. Kirk contends that Shelley is not entitled to additional compensation because she "departs this marriage with substantial assets."[59]

As noted, property received by gift or inheritance is usually not part of the marital estate. But in *Van Newkirk v. Van Newkirk*,[60] we recognized an exception if both spouses have contributed to the improvement or operation of the nonmarital property, or if the spouse who did not receive the nonmarital property nevertheless significantly cared for it during the marriage. We do not apply the *Van Newkirk* exception unless the contributions were significant and we have evidence of their value.[61]

Here, the court found that the *Van Newkirk* exception did not apply because Shelley "failed to introduce evidence of the value of her contribution toward the improvements or operation of [Brozek & Sons]." Plus, the court said that the

---

[58] See *Bauerle v. Bauerle*, 263 Neb. 881, 644 N.W.2d 128 (2002).

[59] Reply brief for appellant at 11.

[60] *Van Newkirk v. Van Newkirk*, 212 Neb. 730, 325 N.W.2d 832 (1982).

[61] See *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997).

decree adequately compensated Shelley for her efforts during the marriage.

On appeal, Shelley does not challenge the court's refusal to apply the *Van Newkirk* exception. Instead, she argues that under *Grace v. Grace*, the court should have given her a cash award for the inadequacy of the marital estate.[62] In *Grace*, the husband had a minority stake in a closely held family ranching corporation with assets of $6.8 to $9.1 million. The corporation employed the husband, paying him $1,500 per month and providing him food, lodging, utilities, a truck, and fuel. He received all of his shares by gift or inheritance.

We concluded that the *Van Newkirk* exception did not apply because the wife had not cared for or contributed to the improvement of the corporation. But we said that *Van Newkirk* was not "an ironclad, rigid rule for all circumstances."[63] We emphasized that the division of property depends on the facts and equities of each case. In *Grace*, "the fact remain[ed] that due to the way the parties to this marriage lived during the marriage, they did not acquire a house or a car or any property a married couple of 16 years, with above average assets, would be expected to acquire."[64] So we ordered the husband to pay the wife $100,000 as part of the division of property.

We have since referred to the award in *Grace* as "compensation for the inadequacy of the marital estate."[65] The Court of Appeals has affirmed the denial of a *Grace* award in cases with marital estates between $500,000 and $600,000.[66] It has

---

[62] *Grace v. Grace, supra* note 1.

[63] *Id.* at 699, 380 N.W.2d at 284.

[64] *Id.* at 701, 380 N.W.2d at 285.

[65] *Medlock v. Medlock*, 263 Neb. 666, 679, 642 N.W.2d 113, 125-26 (2002). See, also, *Walker v. Walker*, 9 Neb. App. 834, 622 N.W.2d 410 (2001).

[66] See, *Shuck v. Shuck*, 18 Neb. App. 867, 806 N.W.2d 580 (2011); *Charron v. Charron, supra* note 36.

affirmed the provision of a *Grace* award in cases in which the marital estate was about $130,000 or "consisted only of two vehicles and some furniture."[67]

We conclude that the court did not abuse its discretion by refusing Shelley's request for a *Grace* award. The parties' net marital estate is about $2.5 million. Shelley might wish that the marital estate were larger, but it is not inadequate. Because Kirk personally farmed some land in addition to his work for Brozek & Sons, he and Shelley acquired substantial assets, such as machinery and crops in storage. If Kirk's efforts during the marriage enhanced the value of Brozek & Sons and Brozek Farms, the increased value was reflected in the price that Kirk paid for Shelley's shares in both corporations.

### (c) No Attorney Fees in Decree

[22,23] Shelley argues that the court should have awarded her about $200,000 for the attorney fees she incurred in prosecuting the divorce. A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases.[68] A dissolution court should consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services.[69]

After reviewing the relevant factors, we conclude that the court did not abuse its discretion by declining to award Shelley attorney fees in the decree. We note that Shelley stated the sums of attorney fees she had incurred from various law firms, but she did not submit an affidavit or other evidence that showed the work performed by her lawyers. An affidavit

---

[67] *Keig v. Keig*, 20 Neb. App. 362, 374, 826 N.W.2d 879, 888 (2012). See *Walker v. Walker, supra* note 65.

[68] *Anderson v. Anderson, supra* note 53.

[69] See *id.*

is not a prerequisite to an attorney fee award, but it is the best practice.[70]

## VI. CONCLUSION

We conclude that the corporate buy-sell agreement in this case does not, by its terms, apply to transfers between spouses. Because the court ordered one spouse to buy the other spouse's shares, it was not bound by the value determined under the agreement. As to the remaining issues raised by Kirk, we do not believe that the court's division of the marital estate or its refusal to award Kirk a credit for the value of long-gone premarital property was an abuse of discretion. And the court had statutory jurisdiction to award Shelley attorney fees for the prospective appellate work of her lawyer after Kirk appealed from the decree. Nor do we find any merit to the errors that Shelley assigns in her cross-appeal. We therefore affirm.

AFFIRMED.

WRIGHT and McCORMACK, JJ., not participating.

---

[70] *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014).