IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

HARTWIG V. HARTWIG

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KELLY I. HARTWIG, APPELLANT,

V.

RON A. HARTWIG, APPELLEE.

Filed June 19, 2018.    No. A-17-422.

Appeal from the District Court for Gage County: RICKY A. SCHREINER, Judge. Affirmed.

Adam R. Little, of Ballew Hazen, P.C., L.L.O., for appellant.

Jeffrey A. Gaertig, of Smith, Schafer, Davis & Gaertig, L.L.C., for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

The district court for Gage County dissolved the marriage of Kelly I. Hartwig and Ron A. Hartwig and ordered Ron to pay alimony to Kelly in the amount of $900 per month for 60 months. On appeal, Kelly argues the alimony award was insufficient in both amount and duration. Finding no abuse of discretion, we affirm.

BACKGROUND

Kelly and Ron were married in 1991 and had two children, both of whom are now adults. Kelly filed a complaint for dissolution of marriage in June 2015 and Ron filed a counterclaim in July. In October, the district court ordered Ron to pay temporary alimony to Kelly of $900 per month, plus ordered him to continue making monthly payments totaling $1,650 for expenses related to the marital home, Kelly's cell phone, and insurance on Kelly's vehicle.

The parties were ultimately able to agree on all issues except for alimony and entered into a property settlement agreement. Pursuant to the property settlement agreement, Kelly will receive

- 1 -

$99,432.61 from the sale of the parties' home. She will also get $122,617 from Ron's Goodyear Tire & Rubber Company Employee Savings Plan through a Qualified Domestic Relations Order (QDRO), $81,022 from Ron's Nebraska Public Power District retirement account, and she will also receive approximately $394.13 per month from Ron's Goodyear pension upon retirement.

Trial was held on the issue of alimony in November 2016. In February 2017, the district court ordered Ron to pay alimony to Kelly in the amount of $900 per month for 60 months, or until the remarriage of Kelly, the death of either party, or until further order of the court. The court approved the parties' property settlement agreement and dissolved the parties' marriage. Kelly's motion for new trial or to alter or amend judgment regarding the alimony award was denied. Kelly appeals.

ASSIGNMENT OF ERROR

Kelly assigns, restated, that the district court's award of alimony was insufficient in both amount and duration.

STANDARD OF REVIEW

Domestic matters such as alimony are entrusted to the discretion of trial courts. *Binder v. Binder*, 291 Neb. 255, 864 N.W.2d 689 (2015). An appellate court reviews a trial court's determinations on such issues de novo on the record to determine whether the trial judge abused his or her discretion. *Id*. Under this standard, an appellate court conducts its own appraisal of the record to determine whether the trial court's judgments are untenable such as to have denied justice. *Id*.

ANALYSIS

The law regarding alimony is well-established.

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. In addition, a court should consider the income and earning capacity of each party and the general equities of the situation.

The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. The ultimate criterion is one of reasonableness. An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record.

*Wiedel v. Wiedel*, 300 Neb. 13, 20-21, ___ N.W.2d ___, ___ (2018). See, also, Neb. Rev. Stat. § 42-365 (Reissue 2016) (setting forth factors to consider and purpose of alimony award). The primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support. *Bergmeier v. Bergmeier*, 296 Neb. 440, 894

N.W.2d 266 (2017). Disparity in income or potential income may partially justify an award of alimony. *Hosack v. Hosack*, 267 Neb. 934, 678 N.W.2d 746 (2004).

At the time Kelly filed for divorce, the parties would have been married approximately 24 years. Both Kelly and Ron were 54 years old at the time of trial. Kelly testified that prior to the marriage she received an associate's degree in business administration and obtained her barber's license; getting her barber's license fulfilled a "life-long dream" of hers. At the time she married Ron, Kelly was working in the salon business. She worked at "a couple of places" in Lincoln while living in Cortland, Nebraska. She moved her salon business to Cortland, sharing space with another barber. The parties' first child was born in 1991. Kelly and Ron built a house and they moved in in December 1994 or January 1995. Kelly then moved her hair business into their house, operating under the name K H Hair Design; this allowed her to save on business expenses like rent and allowed her to be home with the children (their second child was born in 1995). Kelly continued to operate her business out of the home until recently when the home was sold.

In recent years, Kelly's business started to slow down. She said when the kids were young she became more familiar with the community and

> a lot of that I attribute to the kids['] ball games and everything, and then I did a lot of kids -- I did a lot of whole families, kids and then, you know, eventually those kids moved away . . . a lot of people move out . . . and just Cortland really changed. I didn't know a lot of people in town anymore. And it was tougher to maintain the level of customers that I had then.

She had a net profit $8,076 in 2015, and an estimated net profit of $6,000 in 2016. An exhibit received into evidence also shows that K H Hair Design had net profits of $8,042 in 2014 and $6,600 in 2013, and had net losses of $66 in 2012 and $1,598 in 2011. In addition to running K H Hair Design, Kelly took on a part-time job at Hy-Vee in Lincoln (three weeks before trial). She averaged 17 hours per week, earning $10 per hour.

At the time of trial, Kelly was temporarily staying with friends in Firth, Nebraska. She was waiting to see what her financial situation would be after the divorce before she looked for a place to live and found another job and tried "to put all that together." She was still running K H Hair Design, working three days per week, renting a chair at a friend's salon outside of Cortland for $325 per month. She intended to move to Lincoln in "the next 6 months" and continue with her business. Exhibit 4 is her estimate of what her income might be after re-establishing in Lincoln; she estimates a gross income of $17,000 in 2017 (net of $8,800 after expenses). She thinks her income in Lincoln will be higher than in Cortland because it is a bigger city and she has a lot of customers in Lincoln that would be able to refer people to her. She hopes to become gradually more self-supporting than what exhibit 4 shows.

Exhibit 5 is an estimate of Kelly's monthly living expenses ($3,720) based on when she moves to Lincoln. Her estimate includes $1,000 per month in rent; she has been "shown quite a few apartments" "and that's what they range" for a one-bedroom apartment. Her estimate also includes, among other things, $130 for a cell phone, $550 for health insurance, $190 "Medical (current deductible)," $100 for clothing, $100 for gifts and contributions, and $200 for entertainment and miscellaneous items.

Under the temporary order, Ron was paying Kelly $2,550 per month ($900 for alimony and $1,650 for expenses related to the marital home and Kelly's cell phone and automobile insurance). At trial, Kelly asked the court for alimony for 13 years. She asked for an award of $2,000 per month for 5 years, decreasing to $1,500 per month for 5 years, then $1,000 for the last 3 years; this would allow her to "build [her] business up and be more self-supporting." On cross-examination she confirmed that she does not suffer from any type of disability or medical condition that would prevent her from being employed. She also agreed that she possesses the job skills necessary to continue being a barber. She further stated, "I love my job being a hair dresser also, and so . . . to me, that's not an option to work at Hy-Vee full time, because I love my hair dressing job, and I hope to be able to build it up a little bit more." Ron's counsel asked Kelly if she ever thought about trying to get a job that pays $12 per hour and working full time for 40 hours per week ($24,960 per year). Kelly responded, "No, no. No, I wouldn't. I would be working 60 hours a week just to be able to keep up my hair business." On re-direct, Kelly testified that her hair business will always be part time, but she will be able to work more hours and bring in more money, and she will continue to supplement her income by working at Hy-Vee or someplace else. And according to Kelly, there is no 40-hour a week job at Hy-Vee that would be available to her. Ron believes Kelly is capable of earning more than she is "based on . . . doing a 40-hour work week and at least finding a job or what should be comparable, at least, to minimum wage."

Ron testified he works as a substation technician for Nebraska Public Power District, and has been at the company for "[j]ust over nine years." After his last pay raise in March 2016, he was earning $43.74 an hour, which is $90,979.20 per year (after deductions, approximate net of $53,000); everything above that is overtime. Overtime is "not guaranteed," "it really depends on if there's equipment failure or something needs to get done." Ron also owns a one-fourth interest (nonmarital) in Four Rs LLC, which owns some farmland; there is not any income, but there is a possibility of a payout. He did not present evidence regarding his monthly expenses.

Both parties contributed to the care of the home and the children during the marriage. Kelly testified that in addition to working, she did everything to take care of the house except "mow the yard" and "scoop snow." On cross-examination, she said she "did a lot of the parenting" and that Ron was "gone a lot." When asked if there were times during the marriage where Ron would change his shift so that he could be at home to help with the boys, Kelly said, "No." Kelly said Ron varied his shifts when the company asked him to vary his shifts. Ron testified that he did adjust his shifts to be with the children. He said,

> [W]hen our first child was in daycare and the daycare thing didn't work out . . . I was on days, and I traded another employee so I would work third shift so I could help to take care of . . . our youngest son, at the time. And then I had a lot of opportunities to work second shift, but I did not work second shift. That's when she had her job and at least -- I know she was there, but I also was there and capable of helping out [with] the children.

When asked if he and Kelly coparented their children, Ron responded, "That's correct." He said he also helped around the house; he did his own laundry, built the deck, built the downstairs bedroom and family room, and fixed anything mechanical or electrical.

The district court noted that neither party complained of having to forgo any employment or educational opportunities. It said:

At first glance, a marriage of this duration with a disparity of income between the parties this great weighs towards an award of alimony. In this situation, we have two people that engaged in their chosen careers or professions throughout the marriage and continue to do so, each contributed to the marital home during the marriage and neither will have to interrupt a work schedule in the future to care for children. Although [Kelly] will have to re-establish a client base at her new location it does not appear to be entirely because of the fact that her business was located in the home that was sold during these proceedings as she testified that her client base had been in decline prior to this action. [Kelly] intends to work to re-establish a client base but testified that she intends for her hair styling business to remain a part-time job as it was during the marriage. She has obtained a part-time job to supplement her income but does not intend to seek higher paying full-time employment. . . . [A]n award of alimony in this case is appropriate to allow [Kelly] time to rebuild her client base and establish her own means of support, but it is not reasonable to expect [Ron] to fully subsidize [Kelly's] lifestyle into retirement.

The district court's explanation above shows it considered the appropriate factors for alimony, as well as the purpose of an alimony award, in its decision to award Kelly alimony of $900 per month for 60 months.

In her brief, Kelly argues that "[a]bsent an increase in amount and duration" of the alimony award, she "will be unable to make ends meet, and will have to quit her dream job operating K H Salon just to get by." Brief for appellant at 8. She contends "the court should have awarded alimony at a minimum until [she] reaches age 67 and can access retirement funds." *Id*. She also cites to several cases in which the parties' income disparity was considered and larger or longer alimony awards were given than Kelly received in the instant case. Kelly's brief contains a nicely crafted table comparing four other alimony cases, noting the length of the marriage, income and ages of the parties, and the amount and duration of alimony awarded in those cases as compared to her award. In one case, for example, where the length of the marriage was 26 years and the income of the parties was fairly similar to the present case, alimony of $1,500 per month was awarded for a term of 149 months. See *Jensen v. Jensen*, 20 Neb. App. 167, 820 N.W.2d 309 (2012). Kelly claims that given "such drastically different results, it is difficult to reconcile how the instant case is anything but an abuse of discretion." Brief for appellant at 12.

However, no two alimony cases are exactly alike and there are distinguishing factors in the cases cited by Kelly. See, e.g., *Smith v. Smith*, 20 Neb. App. 192, 823 N.W.2d 198 (2012) (husband awarded alimony of $1,500 per month for 10 years; husband had health issues and significant monthly medication and medical expenses); *Jensen v. Jensen, supra* (wife awarded alimony of $1,500 per month for 149 months; wife worked sporadically during marriage because parties agreed she would primarily stay at home with children). See, also, *Becker v. Becker*, 20 Neb. App. 922, 834 N.W.2d 620 (2013) (22-year marriage, wife earned approximately $200,000 more than husband; husband did not forgo any employment or educational opportunities and did not need alimony to meet his monthly expenses; nevertheless, $2,000 per month alimony for 84 months awarded to husband not abuse of discretion). But see *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016) (court did not abuse its discretion by declining to award wife alimony; 20-year length of marriage and disparity of incomes favored award, but marriage did not interrupt wife's career

or education, and no childcare duties to hamper wife's career or educational pursuits after marriage).

In these types of cases we are limited by our standard of review. In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Wiedel v. Wiedel*, 300 Neb. 13, ___ N.W.2d ___ (2018). An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id*. In the instant case, the information regarding Kelly's earning potential is nebulous. For instance, she testified that she was working three days per week for K H Hair Design, but did not say how many hours she worked each day. So we do not know if she was working a combined total of 40 hours per week between K H Hair Design and Hy-Vee. Additionally, her net income is not entirely clear. According to Kelly, her estimated gross income for 2017 from K H Hair Design was $17,000, but after expenses her estimated net income was $8,800. She also works part-time at Hy-Vee (17 hours per week × $10 per hour = $170 per week or $8,840 per year), but there is nothing in our record to show what her net income was after any taxes or other deductions. From what we have available to us in our record, Kelly's estimated total yearly income of $17,640 (net, for the most part), plus the $10,800 per year ($900 per month × 12 months) in alimony she was awarded, totals $28,440 per year. Meanwhile, Ron earns $90,979.20 per year before any overtime (after deductions, approximate net of $53,000 per year). After paying Kelly's alimony of $10,800, he has an approximate total net income of $42,200. Although this was a lengthy marriage and there is some disparity in the parties income, as noted by the district court, Kelly has not forgone any educational or employment opportunities. Further, she is working her "dream job" and plans to continue to do so, despite the fact that it brings in relatively little income. We cannot say that the court's decision to award Kelly alimony of $900 per month for 60 months was patently unfair. The amount of alimony was certainly not unreasonable when considering each party's approximate net earnings once alimony is paid. The duration may seem shorter than sometimes awarded for a 20-plus year marriage, however, as noted earlier, no two cases are alike; each marriage has its own unique set of circumstances. See *Brozek v. Brozek, supra* (no alimony awarded despite length of marriage and disparity of incomes). And as stated by the district court, this award will allow Kelly time to rebuild her client base and establish her own means of support, but it was not reasonable to expect Ron to fully subsidize Kelly's lifestyle into retirement. We cannot say that the district court's alimony award was an abuse of discretion.

## CONCLUSION

For the reasons stated above, we affirm the district court's award of alimony.

AFFIRMED.