IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

MEIER V. MEIER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

TARESS M. MEIER, APPELLANT,

V.

STEVEN C. MEIER, APPELLEE.

Filed July 2, 2024.    No. A-23-395.

Appeal from the District Court for Douglas County: PETER C. BATAILLON, Judge. Affirmed as modified.

Adam R. Little, of Nebraska Legal Group, for appellant.

Haley L. Cannon and Brent M. Kuhn, of Brent Kuhn Law, for appellee.

PIRTLE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Taress M. Meier appeals the Douglas County District Court's decree dissolving her marriage to Steven C. Meier. She challenges the district court's finding that there was not an enforceable settlement agreement. She also takes issue with the court's classification and treatment of a business interest and associated debt, and its impact on the equalization of the marital estate. We conclude the district court abused its discretion by finding that Steven's 25-percent premarital interest in a business, and a subsequent related debt, were marital in nature; the debt should not have been included in the court's equalization of the marital estate. We therefore modify the property equalization judgment by an additional $19,675 owed by Steven to Taress.

- 1 -

## II. BACKGROUND

Taress and Steven were married on October 20, 2012; they had two children together. Taress filed a complaint to dissolve the marriage in April 2021. She requested joint legal and physical custody of the parties' children, child support to be paid by the parties according to the Nebraska Child Support Guidelines, an equitable division of the parties' property and debts, and attorney fees. Steven filed an answer and counterclaim seeking the same.

On February 10, 2023, Taress filed a "Motion to Enter Decree and Motion for Fees." She alleged the following. The parties, with counsel present, held a settlement conference on January 18 and reached an agreement as to all terms in the parenting plan, and as to all values of the marital estate except the specific value of the home. Steven, with counsel present and in the presence of Taress and her counsel, agreed to accept the appraisal value for the marital home when it was provided by the appraiser. The day after the settlement conference, the parties received the appraisal for the home showing a value of $272,000. On January 24, after receiving the appraisal and despite the agreement reached on January 18, Steven communicated through counsel that he was refusing to accept the figure as previously agreed, offered no alternative or justification, and caused his counsel to withdraw from representation. Taress incurred reasonable but substantial attorney fees in negotiating the agreement that Steven was now refusing to abide. Steven, who was requesting that trial be continued and reset, was causing Taress to incur further attorney fees and he should be ordered to pay for those increased costs caused by his bad faith actions. Taress stated that a copy of the fully negotiated agreement would be offered for entry at the time her motion was heard, as would an attorney fee affidavit.

Following an evidentiary hearing on February 21, 2023, the district court entered an order on March 15 overruling Taress' motion. The court stated that in order for there to be an enforceable settlement agreement, there had to be a meeting of the minds as to all material elements, but that there was no such meeting of the minds in this case.

Trial was held on March 16, 2023. Both parties testified, and numerous exhibits were received into evidence. The evidence will be set forth as necessary in our analysis below.

Pursuant to the district court's decree entered on April 24, 2023, the parties' marriage was dissolved, they were awarded joint legal and physical custody of their children, child support was ordered, and the parties' property and debts were divided; Steven was to pay Taress a property equalization judgment of $42,020.94. As relevant to this appeal, the court found that Steven's 25-percent interest in a business acquired before the marriage was marital in nature. It determined that loans totaling $25,000 were premarital and should not be included as marital debt, but that $39,350 in loans owed to Steven's mother and stepfather were a marital debt and each party was obligated to pay one-half of that debt (Taress' portion to be "set off against the balance of the marital estate and accounted for in the property equalization payment"). Without assigning any value to the business, the court awarded Steven the entirety of his interest in the business and all value or liability associated with it as his separate property. Each party was to pay their own attorney fees.

Taress appeals.

## III. ASSIGNMENTS OF ERROR

Taress assigns that the district court erred by (1) failing to enforce a valid oral settlement agreement, (2) improperly classifying a nonmarital debt as marital, (3) classifying a personal debt as marital where there was no obligation to repay, (4) improperly valuing marital property, and (5) admitting exhibit 49 (business documentation) despite objections on foundation and hearsay grounds.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## V. ANALYSIS

### 1. TARESS DID NOT FORFEIT RIGHT TO APPEAL

Initially we note that after both parties briefed this marriage dissolution appeal, Steven filed a "Motion to Dismiss Appeal and Memorandum Brief" on February 29, 2024, claiming that Taress forfeited her right to appeal because she accepted the benefits of the decree. Taress filed an objection to Steven's motion on March 7. We overruled Steven's motion to dismiss without prejudice to consider the issue of acceptance of the benefits in our final opinion.

Steven claims that Taress forfeited her right to appeal because she accepted the benefits of the decree. A cashier's check for $42,020.94 was cashed on June 14, 2023; Taress filed a "Receipt" on February 16, 2024, acknowledging receipt of that sum. Steven claims the "acceptance of benefits rule indicates 'an appellant may not voluntarily accept the benefits of part of a judgment in the appellant's favor and afterward prosecute an appeal or error proceeding from the part that is against the appellant.'" Brief for appellant in support of motion at 4-5 (quoting *Liming v. Liming*, 272 Neb. 534, 538, 723 N.W.2d 89, 93 (2006)).

However, as pointed out by Taress in her objection to Steven's motion, "[a]n exception to the acceptance of benefits rule exists where the right to the benefit accepted is absolute and cannot possibly be affected by reversal of the judgment." *Liming v. Liming*, 272 Neb. at 539, 723 N.W.2d at 94. "It is the possibility that [the] appeal may lead to a result showing that the party was not entitled to what was received under the judgment appealed from that defeats the right of appeal." *Id*. "Where there is no such possibility, the right to appeal is unimpaired by the acceptance of benefits under the judgment appealed from." *Id*. Therefore,

> the acceptance of benefits rule has no application where one is shown to be so absolutely entitled to the sum collected or accepted that reversal of the judgment or decree will not affect his or her right to it, as in the case of a collection of an admitted or uncontroverted part of his or her demand. [Citations omitted.] The rule does not apply when the appellant is conceded to be entitled to the thing he or she has accepted and where the appeal relates only to an additional claim on his or her part.

*Id*. The Nebraska Supreme Court ultimately held that

> a spouse who accepts the benefits of a divorce judgment does not waive the right to appellate review under circumstances where the spouse's right to the benefits accepted is conceded by the other spouse, the spouse was entitled as a matter of right to the benefits accepted such that the outcome of the appeal could have no effect on the right to those benefits, or the benefits accepted are pursuant to a severable award which will not be subject to appellate review.

*Id*. at 544-45, 723 N.W.2d at 97.

In the present appeal, Taress seeks only to increase the amount of equalization owed to her by eliminating the $39,350 business debt, which she claims was a nonmarital debt. Nothing argued on appeal would reduce the amount she already received; if successful, Steven would owe her more money to equalize the marital estate. Further, Steven has conceded Taress' right to the $42,020.94 by making that payment to her rather than cross-appealing any matters related to how the marital estate was calculated. Nothing being asserted on appeal would have any effect on Taress' right to at least the court-ordered equalization amount. Therefore, Taress did not forfeit her right to appeal by accepting the $42,020.94 equalization payment.

## 2. PROPERTY DIVISION

All of Taress' assigned errors stem from the district court's classification of Steven's 25-percent business interest as a marital asset, and its treatment as a marital debt the $39,350 in personal loans for the business that Steven received from his mother and stepfather, Margaret and Steven Swerczek (the Swerczeks). By not assigning any value to the business interest itself, and then including the personal loans in the equalization of the marital estate, Taress received an equalization judgment that was $19,675 lower than what she sought ($39,350 debt ÷ 2 = $19,675). In her brief, Taress represents that exhibit 4 "is the chart that reflects the purported agreement." Brief for appellant at 11. We observe that exhibit 4 is identical to the "property equalization chart" attached to the decree, except that exhibit 4 does not contain the $39,350 business related debt at issue. Exhibit 4 reflects Taress being owed $61,695.94 to equalize the marital estate. The court ordered an equalization of $42,020.94, which is exactly $19,675 less than what Taress sought.

Guided by *Parde v. Parde, supra*, we conclude that the district court abused its discretion by classifying as marital Steven's 25-percent business interest and the $39,350 in personal loans associated with that business interest. By removing this debt from the court's equalization calculation, Steven would owe Taress a total equalization judgment of $61,695.94. Since he has already paid the $42,029.94 originally ordered, he will owe Taress another $19,675 to equalize the marital estate.

### (a) General Principles of Law

Neb. Rev. Stat. § 42-365 (Reissue 2016) authorizes a trial court to equitably distribute the marital estate according to what is fair and reasonable under the circumstances. *Parde v. Parde, supra*. In a marital dissolution action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Id*. There is no mathematical formula by which property

awards can be precisely determined, but as a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Id.*

In a marital dissolution action, the equitable division of property is a three-step process. The first step is to classify the parties' property as either marital or nonmarital, setting aside the nonmarital property or nonmarital portion of the property to the party who brought the property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. And the third step is to calculate and divide the net marital estate equitably between the parties. *Id.*

Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id.* Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists. *Id.* Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Id.* If the separate property remains segregated or is traceable into its product, commingling does not occur. *Id.* The burden of proof rests with the party claiming that property is nonmarital. *Id.*

Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Parde v. Parde,* 313 Neb. 779, 986 N.W.2d 504 (2023). The original value of an asset may be nonmarital, while all or some portion of the appreciation of that asset may be marital. *Id.* The appreciation or income of a nonmarital asset during the marriage is marital insofar as it was caused by the efforts of either spouse or both spouses. *Id.*

(b) Evidence at Trial

*(i) Steven's Testimony*

Steven testified that he and his three business partners formed a limited liability company, and that company purchased a restaurant franchise in 2012 (the company and franchise will hereinafter be collectively referred to as the franchise). They obtained approval from the franchisors "probably somewhere around [the] July time frame." In August, Steven borrowed $25,000 from the Swerczeks to purchase his 25-percent interest in the franchise; Steven's business partners owned the other 75-percent interest. Regarding the $25,000 he borrowed from the Swerczeks, Steven said that "[t]here [were] two loans in August," one for $10,000 and one for $15,000--Steven did not believe that Taress was responsible for any portion of that $25,000.

Steven and Taress were married in October 2012, and the first franchise location opened in December. Steven took out "two [more] loans" from the Swerczeks in December," for "something along [the] lines" of $7,500 and $3,500. Steven did not have any written loan agreements with the Swerczeks.

Steven and his partners opened a second franchise location in 2014, and a third location in approximately 2016. According to Steven, there was not enough business to support a third location; "2017 was probably the time that it started where we were having to actually make capital injections into the business in order to keep the doors open." In 2017, Steven's three business partners wanted to sell their interest in the franchise, and the Swerczeks purchased their 75-percent interest; Steven continued to own his 25-percent interest.

According to Steven, Taress has never been listed as an owner on any of the documents for the franchise. And Taress never worked for the franchise. Steven said, "we had to use some of the marital money," approximately $5,000, to make a "capital contribution" one time to the franchise, but Steven did not recall the specific date.

Steven testified that he took one distribution of approximately $5,000 out of the business after December 2012. Then, as the business went along, there was another opportunity where a distribution could have been taken, but "myself and my previous business partner" chose to "pay[] off the remainder of the initial bank loan for the first location" instead of taking a distribution.

Steven was the "in-store active manager that did operations" for the franchise until approximately 2018 (when he took a job with another employer); since then, he has only been doing "administrative work in [his] spare time and payroll." He had been earning a salary of $20,000 per year from the franchise since 2018, and more in the years prior; the money he earned was deposited into the parties' joint accounts.

Steven last drew a salary from the franchise in December 2022. He stopped taking a salary "[b]ecause the business is under water and it [cannot] afford to pay me." Steven said, "We had went almost 2 years without having to put any capital into the business [because of the COVID-19 pandemic bailout funds]," but now he "wanted to try to maintain not having to put new money [capital contributions] into a business that's struggling," so he "decided to stop taking a salary." Steven was asked if he intended to start taking a salary again if the business improved. He replied, "Our intent is to sell the business." Steven testified that there were currently two existing franchise locations open, but the third location had closed.

Steven tried to sell the business "as recently as January [2023]," and "the best offer that was received was . . . $112,000," but that potential buyer "walked away from the table after doing a little bit more due diligence." In any event, Steven would not have realized any money from that sale because "[a]t that point in time, the note payable to the Swerczeks was $300,000," and even factoring in the businesses' assets and cash, there would have been a loss.

Steven was asked about exhibit 49. He said,

It's basically a -- kind of a summation of the liability that we have for [the franchise]. And the equity is basically -- it's a -- as of January [2023], we were trying to sell it. And so we put together their best offer price, and then we added on the pre-paids and the cash and inventory and stuff of that nature that we had and then the liabilities.

The exhibit is as follows (grid lines and color variation omitted):

**[FRANCHISE] LIABILITY**

    **Loans**

Date

| Date | Amount | |
|---|---|---|
| 8/31/2012 | $ 10,000.00 | [not included in calculation] |
| 8/31/2012 | $ 15,000.00 | [not included in calculation] |
| 12/14/2012 | $ 10,500.00 | |
| 12/29/2012 | $ 3,750.00 | |
| 4/24/2014 | $ 7,500.00 | |
| 2/7/2017 | $ 10,000.00 | |
| 9/20/2017 | $ 10,000.00 | [omitted] |

|  |  |  | $ 41,750.00 | [Steven] | $ 20,875.00 |
|  |  |  |  | [Taress | $20,875.00] |

**Equity**
**As of 1-27-2023**

| | | |
|---|---|---|
| Offer Price | | $ 112,000.00 |
| Liabilities | - | $ (26,928.00) |
| Prepaids | + | $ 24,918.00 |
| Cash | + | $ 49,460.00 |
| | | $ 159,450.00 |
| Note Payable | - | $(300,000.00) |
| | | $(140,550.00) |
| Steven's Share | x.125 | $ (17,568.75) |
| Taress' Share | x.125 | $ (17,568.75) |

Total Liability

| | | |
|---|---|---|
| $ (20,875.00) | + | $ (17,568.75) $ (38,443.75) |
| $ (20,875.00) | + | $ (17,568.75) $ (38,443.75) |

According to Steven, the "Prepaids" were "inventory and things on hand at the stores." The "Liabilities" were "an aggregation of all the liabilities of the business . . . as of 1/27." When asked if he had any documentation for what made up the $26,900 in liabilities, Steven replied, "I don't have that with me at the moment," "[b]ut it's all in QuickBooks is where that information came from."

Steven explained that the two loans from August 31, 2012, comprised the original $25,000 he used to purchase his 25-percent interest in the business prior to the parties' marriage; he reiterated his position that Taress is not responsible for that debt. The other five loans from December 2012 through September 2017, "were additional amounts that were required to keep the business going or keep our position in the business"; "in 2014 and 2017 they were required to keep our position as 25 percent owners because we were opening new stores." That additional money was borrowed from the Swerczeks. According to Steven, the money from the Swerczeks was a loan, and "the plan was always to sell the business and pay them back from the proceeds, but unfortunately, it has not worked out splendidly." Steven believed the additional debt to the Swerczeks was marital debt because it was incurred during the marriage.

Steven testified that when he borrowed money from the Swerczeks, "we didn't sign any promissory note, but it did get put on the balance sheet in the books of [the Swerczeks], so it was listed on their bank statements." Steven was asked if the Swerczeks, who were owner-investors, were paying themselves back through retained earnings. He replied, "There are no retained earnings actively, but they're trying to pay themselves back, yes." When asked how payments were recorded, Steven said, "Just ledgers, both via [the] Swerczek's [sic] books and on [the franchise's] books." "Theoretically, if there is a profit, they would be able to keep paying themselves back."

The following colloquy then took place between the district court and Steven:

THE COURT: . . . So this [franchise] business, the total amount -- well, you loaned the business $66,700. And that was $25,000 before you got married, and then after you got married you put in $41,750, correct?

[Steven]: That's correct, sir.

. . . .

THE COURT: Okay. Who are those loans from?

. . . .

[Steven]: They're from my mom and stepfather.

THE COURT: And so then when your mom and your stepfather bought the other 75 percent, they paid $300,000 for that, correct?

[Steven]: I don't remember the exact price. But the total -- yeah, the total amount of the notes over the years ended up being $300,000.

. . . .

THE COURT: You still own 25 percent of the business?

[Steven]: That's correct.

THE COURT: And these loans that were made after the marriage, those have all been satisfied?

. . . .

[Steven]: . . . . The [$]41,750 has not been paid back.

. . . .

THE COURT: And who do you owe that to?

[Steven]: Steve and Peg Swerczek.

THE COURT: Okay. And that's not part of this $300,000; is that correct?

[Steven]: That's correct. . . .

. . . .

THE COURT: The 10,000 and the $15,000 that were loans you put in before the business, where did you get that money?

[Steven]: The same place.

THE COURT: Okay. All right. So that total amount of $66,700 is loans that you put into the business and the business owes you?

[Steven]: It would -- it's just an ownership percentage. So yes, theoretically --

. . . .

THE COURT: I'm asking what the partnership owes you. I'm just talking accounting here.

[Steven]: Okay. Yeah, the capital that we put in is that [$]66,750. So yes.

THE COURT: Okay. And the capital that your mother and her husband put in was -- is it now $300,000?

[Steven]: That's correct.

THE COURT: Okay. Any other -- okay. So if that's the case, then the partnership owes total loans of $366,750 to the partners. Would that be accurate or not? Or do you know?

[Steven]: . . . . So it should just be the $300,000 that is owed to [the Swerczeks] because they own 100 percent of the debt of [the franchise]. But I went to them privately to try to get a personal loan from them to contribute my capital.

THE COURT: But that's a separate transaction, right?

[Steven]: Yes.

THE COURT: There was a note -- is there an actual written note from the business to your mother and her husband?

[Steven]: There is -- it is on their books. There's a note on their books, and there's a note on --

THE COURT: What's that mean, "on their books"?

[Steven]: In QuickBooks there's a note that says note payable from . . . Partners to [the Swerczeks] in the amount of $300,000.

THE COURT: Okay. And that gives them 75 percent of the business, right?

[Steven]: That's correct.

THE COURT: And that $300,000 you believe includes the $66,700 that you obtained from them in a separate transaction some years before?

[Steven]: That's correct.

THE COURT: All right. That just dashed all my understanding as to bookkeeping and accounting. But that's okay.

Steven confirmed that there was no written promissory note between him and the Swerczeks.

Steven's position is that his 25-percent interest in the franchise is marital, and therefore he and Taress would each have a 12.5 percent interest. Steven believed that Taress "was entitled to the ownership that came through [him]"; it was his understanding that Nebraska was a community property state. But other than being his wife, Taress had not participated in the running of the business. However, Steven did not believe that the franchise had any value "at this moment." When asked if he thought it was "under water," Steven replied, "Yes." Steven was asked what amount of money he was contending was marital in nature with respect to the franchise. He replied, "roughly $38,000, or something along those lines" at the time of parties' separation; "$38,000 would be approximately 12 and a half percent of the total that the company owned, which would be her approximate ownership share in the company." (We note that based on Steven's exhibit 49, that $38,000 amount would be Taress' alleged share of the liability/debt.)

Steven stated that the parties filed joint tax returns during the marriage, and "there [were] quite a few years where the money that we lost because of [the franchise] actually -- we got a much bigger refund because of the fact that we owned [the franchise] together and filed a joint tax return."

On cross-examination, Steven confirmed that there was never an agreement that he would make installment payments to the Swerczeks for the money he borrowed from them to obtain his 25-percent interest; the intent at the outset was that the Swerczeks would be paid back that money from the proceeds of a sale of the business. The following colloquy took place between Taress' counsel and Steven:

Q [by Taress' counsel]. Okay. So there was never an agreement for you to make installment payments; is that right?

A [by Steven]. No, there was not.

Q. Have you made any installment payments to your parents?

A. Not on the debt to the business, no.

Q. Okay. What is the plan for you to make those installment payments?

A. Currently there is not a plan to make those payments.

Q. So then what would the expectation be of [Taress] if she were to be ordered to pay twelve and a half percent of the debt? How would she be expected to do that if there are no clear terms?

A. Well, she's not being asked to be paid [sic] anything. I'm asking that my debt, the debt to my family, be considered in the overall picture and be taken off of my equity that I have in my home.

Q. But you have no plan to actually pay that debt, correct?

A. Not at the moment. But that does not mean that it does not require payment.

Q. What would happen if you didn't?

A. If I didn't pay the debt?

Q. Uh-huh.

A. Then it would probably get taken off of an inheritance at some point in time.

When asked whether the possibility of an offset against his inheritance had been discussed with the Swerczeks, Steven said that "there was a side comment that said worst case scenario, it will get taken out of your inheritance, but that was never the plan." Steven confirmed that Taress would have no right to his inheritance.

Steven was asked if an appraisal was ever conducted of the business while he was trying to sell it. He replied, "No." He also did not know what it would cost to purchase a similar franchise today.

The following colloquy took place between Taress' counsel and Steven:

Q [by Taress' counsel]. You testified that you believe the 25 percent interest right now is worthless; is that accurate?

A [by Steven]. That's correct.

Q. Why haven't you offered to give the interest to [the Swerczeks] so that they're a hundred percent owners?

. . . .

A. I guess because they wouldn't want it. But I don't know. I guess that's a good question.

Q. Would you be willing to sell your interest for zero dollars to [Taress] so that she could take a go at it?

A. If she wants to assume the debt?

Q. I didn't say that. I'm asking if you'd be willing to sell it for zero dollars.

A. If we could walk away from the personal guarantees, if she wants to operate it, absolutely.

Q. If someone were to offer to buy it for zero dollars but assume the debt, would you be willing to do that?

A. If they assumed the debt and said, we'll pay you no money but we will assume all your loans, I believe that myself and [the Swerczeks] would run to that opportunity, yes.

*(ii) Taress' Testimony*

According to Taress, Steven's mother and stepfather loaned him $25,000 to become a partner in the franchise before the parties got married. Taress was informed that Steven had borrowed subsequent funds from his mother and stepfather, but she was not involved in any communication regarding those loans, nor was she aware of any amounts. When asked if she ever had substantive conversations with Steven about how much money should be taken out or how it should be repaid, Taress replied, "No."

Taress did not personally contribute any money to the business, was not involved in forming the business, had no input in the acquisition of the franchise, never worked for or received any income from the franchise, never held herself out as an owner, and never filed taxes as a partner or owner. On cross-examination, Taress acknowledged that she and Steven filed joint tax returns during their marriage. Additionally, Steven's paycheck from the franchise was deposited into an account that she had access to.

The following colloquy took place between Taress and her counsel:

Q [by Taress' counsel]. Is it true in August we were notified that they would not be pursuing [the franchise] as part of the marital estate?

A [by Taress]. That was my understanding.

[Q.] And is that why we didn't pursue any sort of business valuation or any other discovery regarding these entities?

. . . .

A. Yes.

Q. . . . So as we sit here today, because of the representations, we weren't able to really dig into the finances of [the franchise]; is that right?

A. Correct.

. . . .

Q. . . . In fact, it wasn't until we were here a few weeks ago on another motion that we were made aware that that was now an issue begin [sic], correct?

A. Correct.

Q. Are you asking the Court to find that [the franchise], whatever interest [Steven] may own in it is his premarital property and should be solely awarded to him?

A. Yes.

Q. And you understand that that means that even if there's an equity value in that, that you wouldn't be entitled to that?

A. Correct.

On cross-examination, Taress testified that Steven's mother and stepfather gifted them money more than 5 years ago to pay off her premarital student loan debt; Taress did not recall the amount of the gift but agreed that it was roughly $15,000. As established on redirect examination,

- 11 -

at no point during the case had Steven asked that there be any offset for Taress' student loans that were paid off during the marriage.

### (iii) Steven Swerczek's Testimony

Steven Swerczek (Swerczek) testified that he loaned Steven $25,000 to purchase a 25-percent interest in the franchise; the money was not a gift. Swerczek confirmed that he subsequently made $41,750 in additional loans, as set forth in exhibit 49. There was no written loan agreement, it was a verbal agreement with no interest. To date, the $41,750 has not been paid back. When asked if there had been some money paid back, Swerczek replied, "I think . . . there might have been six payments of $400 a month." And Swerczek responded affirmatively when asked if those payments were on the capital contribution loans. (However, Steven testified that the $2,400 in payments were related to Taress' student loan, making the balance of that loan $12,600, and then the Swerczeks told him and Taress that they were going to forgive the remainder of that loan.)

Swerczek testified that in 2017, he and his wife purchased Steven's partners' 75-percent interest in the business. The Swerczeks did not pay the partners money; "[the three partners] had a loan with a bank" and owed about $291,000, and "[b]asically, we paid off their loan, and [we] became the bank." The Swerczeks still owned a 75-percent interest in the franchise, and the franchise was losing money. Swerczek had signed personal guarantees for debt owed by the franchise, including for the space being leased and with the franchisor; there was still "a year and a half on one [lease space], 3 years on the other that we're liable for." Swerczek did not believe the franchise had any value at the present time. Swerczek was asked "if somebody came and said, I'll take over and pay all the debt on the business and you get nothing, would you do that deal?" He answered, "Yes." However, Swerczek would still require Steven to pay what he owed to them.

Swerczek stated that Steven owed them $79,350 as of June 5, 2021, "[b]ut that has to be broken down to what was premarital, et cetera, you know." Swerczek later stated that $15,000 was gifted and that Steven used that money to pay off some of Taress' premarital loans; "bookwise, it's [sic] hasn't [come] off, the 79,350" but Steven was told it would be treated as a gift. If Steven does not pay the Swerczeks back, "[i]t stays on the books," but Swerczek would not sue Steven. Swerczek denied ever telling Steven that if he did not repay the debt that it would be offset in his inheritance. However, on cross-examination, Swerczek was asked if maybe someone else said the debt would be offset against the inheritance. Swerczek replied, "It could have been my wife . . . but I did not."

The district court later clarified with Swerczek where the $79,350 came from. It included the $25,000 in initial loans, the $41,750 in subsequent loans, and the $15,000 gift, and had taken into account the six $400 payments that Steven made ($25,000 + $41,750 + $15,000 - $2,400 = $79,350). Steven owed $64,350 after the $15,000 gift was taken off of the $79,350. When Steven was recalled to the stand, he reiterated that $25,000 was premarital, "[s]o the total number that we owe [the Swerczeks] minus the premarital is $41,750."

Swerczek stated that Taress is "a listed partner" in the business. However, Steven was recalled to the stand and stated that Taress was not a listed partner, and that Swerczek was mistaken.

In the "Judges Notes" for April 17, 2023, found in our transcript, the district court stated: [T]here is a marital debt which are the loans to [Steven] for the business which were $41,750.00 during the marriage, of which $2,400.00 has been paid to date. Thus, there is a balance due of $39,350.00. This is a marital debt and each party is obligated to one-half of this amount. The Court found that it was unable to make a decision as to the value of the business as there was insufficient evidence. [Steven] is to keep all assets and liabilities of the business except for the loan from his parents.

In its subsequent April 24, 2023, decree, the district court found that Steven's 25-percent interest in the franchise "is marital in nature"; "While [Steven] owned this interest prior to their marriage, his work, involvement, and income received from the business after the marriage created a marital interest in the business." The court found "the marital debt to be $39,350.00 owed to [the Swerczeks], and each party is obligated to pay half the debt." Taress' portion of the debt ($19,675) "shall be set off against the balance of the marital estate and be accounted for in the property equalization payment." Steven was awarded the entirety of his interest in the franchise "and all value or liability associated therewith as his separate property." A property equalization chart was attached to the decree. The court ordered Steven to pay a $42,020.94 property equalization payment to Taress.

### (d) Did the District Court Abuse its Discretion?

#### (i) Exhibit 49

Taress contends that "[e]xhibit 49 is the only documentation that Steven provided about the value of the business and its purported debts," and that the "document was generated by Steven as a 'summation of the liability' for [the franchise]." Brief for appellant at 28. She argues that the district court erred by receiving that exhibit into evidence over her hearsay and foundation objections. In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. *In re Hessler Living Trust*, 316 Neb. 600, 5 N.W.3d 723 (2024). Here, exhibit 49 was not the only evidence of the business' value and purported debt. Steven testified that there were $41,750 in personal loans from the Swerczeks after the parties' marriage that were "used to get into the position to be 25 percent owners." Swerczek confirmed that those loans were made to Steven so that he could make his capital contributions for his 25-percent interest in the franchise. Steven also testified that his 25-percent interest did not have any value "at this moment." When Swerczek was asked if the business had any value at the present time, he responded, "No." And both Steven and Swerczek believed that the business was currently under water financially. Thus, even if the district court should not have received exhibit 49 over Taress' hearsay and foundation objections, there would be no reversible error because the exhibit did not unfairly prejudice Taress.

#### (ii) Classification of Franchise Interest and Related Debt

Taress contends that Steven's "business interest was acquired entirely prior to the marriage, and any debt associated therewith should be set aside as Steven's separate property." Brief for

appellant at 22. She contends that, "At no point did Steven acquire any additional ownership interest, he has owned a 25% interest at all times." *Id.* She further argues that even if the debt is considered marital, the district court did not "assign any value for the business to the marital estate," and therefore, if Steven later recovered his capital contributions, "it would now be a windfall to him." *Id.* at 23.

We agree with Taress and find that the district court abused its discretion when it found that Steven's 25-percent business interest in the franchise was marital. The evidence is clear that Steven owned his 25-percent interest in the franchise prior to the parties' marriage, therefore it was nonmarital property. See *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016) (property accumulated and acquired by either spouse during marriage is part of marital estate; exceptions include property spouse acquired before marriage, or by gift or inheritance). Steven continued to own a 25-percent interest in the franchise throughout the parties' marriage. However, Taress took no part in the business--she did not personally contribute any money to the business, was not involved in forming the business, had no input in the acquisition of the franchise, never worked for or received any income from the franchise, never held herself out as an owner, and never filed taxes as a partner or owner (she and Steven did file joint tax returns). Additionally, none of Steven's efforts during the marriage led to an appreciation of his nonmarital ownership interest; both he and Swerczek testified that the business was financially under water and had no value at the time of trial. See *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023) (original value of an asset may be nonmarital, while all or some portion of appreciation of asset may be marital; appreciation or income of nonmarital asset during marriage is marital insofar as it was caused by efforts of either spouse or both spouses). Steven did earn a salary for his work at the franchise during the marriage, and his income from this nonmarital asset was properly considered as marital income. However, simply earning an income from a nonmarital asset does not convert a nonmarital ownership interest in the franchise into a marital asset. Steven's 25-percent ownership interest was and continued to be a nonmarital asset.

Steven did borrow money from the Swerczeks during the parties' marriage in order to maintain his 25-percent interest in the franchise. And although Taress was informed that Steven had borrowed subsequent funds from his mother and stepfather, she was not involved in any communication regarding those loans, she was not aware of any amounts borrowed, nor did she have any substantive conversations with Steven about how much money should be taken out or how it should be repaid. Steven and the Swerczeks made agreements among themselves on how to maintain the business and Steven's interest in it; there was no marital benefit to Taress and Steven in those business dealings. Importantly, marital debt includes only those obligations incurred during the marriage for the joint benefit of the parties. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). In this case, the money Steven borrowed was not for the joint benefit of the parties; it was to maintain his nonmarital 25-percent interest in the franchise. Additionally, Taress argues, "[t]he evidence is clear that there is no real obligation for Steven to repay the loan" to the Swerczeks. Brief for appellant at 23. See *Schaefer v. Schaefer*, 263 Neb. 785, 642 N.W.2d 792 (2002) (parties borrowed approximately $51,000 from husband's parents during marriage without promissory notes or other documents obligating repayment of debt, and last payment was made 8 years prior to trial; Supreme Court found district court did not abuse its discretion in finding debt was husband's personal debt as there was no evidence in record to support existence of

enforceable marital debt). In this case, the money Steven borrowed from the Swerczeks was a personal loan used to maintain his nonmarital ownership interest in the franchise; there was no joint benefit to the parties in Steven's verbal agreements with the Swerczeks regarding the personal loans between them. Based on the record before us, the district court should have excluded the purported debt from the marital estate.

In summary, Steven's 25-percent ownership interest in the franchise was acquired before the marriage and constituted a nonmarital asset. Both his nonmarital ownership interest, and the associated debt to maintain his interest, should have been excluded from the marital estate. Accordingly, we find that the $42,020.94 property equalization payment awarded to Taress should be increased by $19,675, which results in a total equalization judgment of $61,695.94. Since Steven has already paid the original $42,020.94 equalization judgment, the remaining balance owed by Steven to Taress is $19,675.

### 3. SETTLEMENT AGREEMENT

Since we have already determined that Steven owes Taress an additional $19,675 to equalize the marital estate, for a total equalization judgment of $61,695.94, it is unnecessary for us to address Taress' assigned error related to the alleged settlement agreement. Taress' position was that she was entitled to receive $61,695.94 from Steven to equalize the marital estate based upon the parties' alleged oral settlement agreement that purportedly did not include the business related debt. Given that the end result is the same, we need not address Taress' claim that the district court erred as a matter of law by failing to enforce the parties' settlement agreement. See *Paw K. v. Christian G.*, 315 Neb. 781, 1 N.W.3d 467 (2024) (appellate court not obligated to engage in analysis not needed to adjudicate controversy before it.)

### VI. CONCLUSION

For the reasons stated above, we conclude that the $39,350 in personal loans Steven received from the Swerczeks should not have been included in the marital estate. We therefore modify the property equalization judgment owed by Steven to Taress as set forth above.

AFFIRMED AS MODIFIED.