IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

MANETTI V. SMITH

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

SARAH MANETTI, APPELLEE,

V.

JACOB SMITH, APPELLANT.

Filed March 11, 2025.   No. A-24-329.

Appeal from the District Court for Douglas County: MOLLY B. KEANE, Judge. Affirmed as modified.

Justin A. Quinn for appellant.

Catherine A. Dunn, of Welch Law Firm, P.C., for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Jacob Smith appeals the Douglas County District Court's decree dissolving his marriage to Sarah Manetti, awarding her physical custody of the parties' child, ordering him to pay child support, and dividing the parties' marital estate. Jacob challenges the district court's decision to deny his motion to continue trial, his motion for new trial, and his motion to vacate, all of which related to the fact that he appeared pro se at trial and wanted to obtain counsel to represent him. He also challenges the court's division of the marital estate and its calculation of child support. We affirm as modified.

## II. BACKGROUND

Sarah and Jacob married in October 2021. They have one child, born in 2018.

On April 17, 2023, Sarah filed a complaint for dissolution of marriage seeking sole legal and physical custody of the parties' child, child support, an equitable division of the parties' assets

and debts, and an award of attorney fees. Sarah claimed that Jacob was not a fit and proper person to be awarded legal and physical custody of the parties' child. In his answer and "[c]ountercomplaint" for dissolution of marriage, Jacob denied Sarah's allegation that he was not a fit and proper person to be awarded custody of the parties' child. Jacob sought sole legal and physical custody of the parties' child, child support, an equitable division of the parties' assets and debts, and an award of attorney fees.

## 1. TEMPORARY ORDER

Sarah and Jacob each filed a motion for a temporary order seeking sole legal and physical custody of the parties' child, child support, and attorney fees and costs. Sarah requested that the district court order exclusive possession of the marital residence to Jacob, subject to his payment of the mortgage, taxes, insurance, and other expenses related to the property, until it was sold; Jacob requested "sole possession of the marital residence during the pendency of these proceedings."

On July 17, 2023, the district court entered a temporary order awarding Sarah sole physical custody of the parties' child, with the parties having joint legal custody. Jacob was ordered to complete a 10-panel hair follicle drug test immediately following entry of the order. Until he provided a negative 10-panel hair follicle test, Jacob was to have specified supervised parenting time, and he was to arrange and pay for any costs related to his supervised parenting time. Once he provided a negative 10-panel hair follicle test, Jacob was to have specified unsupervised parenting time; prior to each exchange for his unsupervised parenting time, he was to complete a 5-panel UA drug test and provide the results to his attorney and Sarah. Neither party was to consume or be under the influence of any illegal or unprescribed drugs before, during, or after their parenting time. Sarah was to arrange the child's transportation for Jacob's parenting time. During the temporary period, the parties were to only communicate about the minor child "via OurFamilyWizard."

Jacob was to pay child support in the amount of $580 per month. The parties were each to be responsible for 50 percent of the "[n]on-reimbursed/[u]ninsured" medical expenses on behalf of the minor child. Additionally, the parties were each to be responsible for 50 percent of work-related childcare expenses and school tuition incurred on behalf of the child.

Jacob was awarded exclusive possession of the marital residence, subject to his payment of the expenses associated with the property; he had 30 days to obtain an appraisal of the residence and provide proof that he was preapproved for a mortgage loan, otherwise the parties were ordered to put the residence up for sale with a named realtor.

The parties were mutually restrained from transferring, encumbering, hypothecating, concealing or in any way disposing of the property of the parties other than in the usual course of business or other than for the necessaries of life.

## 2. CONTEMPT ACTION

On September 1, 2023, Sarah filed an affidavit and application for an order to show cause. She alleged that Jacob violated the district court's temporary order when he (1) failed to complete drug testing; (2) failed to pay any child support and was $1,160 in arrears; (3) failed to pay his

share of the child's uninsured medical expenses, after school childcare, and extracurricular activities; (4) failed to pay expenses associated with the marital residence; (5) failed to secure financing to purchase the marital residence and failed to put the residence up for sale; and (6) withdrew at least $1,300 from the parties' joint account and put his truck (a marital asset) up for sale. The district court entered an order on September 6, directing Jacob to appear at a hearing on September 25 and show cause why he should not be held in contempt for failing to obey the temporary order.

On September 7, 2023, Jacob's counsel filed a motion to withdraw. The district court granted counsel leave to withdraw on September 12. On September 25, a hearing took place on the show cause order, however, Jacob appeared pro se and requested "either some financial aid or time to get a new lawyer." The court informed Jacob that it would continue the hearing so he could obtain counsel, but if he "show[ed] up on the next date without an attorney," they would "go forward." When the court asked Jacob if he agreed with Sarah's counsel that the case was ready to be set for trial, he responded, "I believe so." The court informed the parties that trial was scheduled for one day on November 28; that it was the "first backup trial scheduled that day." On September 25, two separate orders were entered. One order scheduled trial for November 28. The other order indicated that the show cause hearing scheduled for that day was continued to October 11.

Although the October 11, 2023, proceedings do not appear in our record, an "Order for Contempt" entered on October 16, states that a show cause hearing was held on October 11 and Jacob had appeared pro se. The district court found Jacob in willful and contumacious contempt for failing to pay child support, failing to complete a 10-panel hair follicle test or subsequent 5-panel UA drug test, failing to establish an account for the communication application, failing to pay the mortgage and utilities for the marital residence, withdrawing $1,300 from the joint marital account without explanation, and attempting to sell the vehicle. The court sentenced Jacob to 60 days in the Douglas County Correctional Center beginning May 1, 2024, but said that he could purge himself of the contempt by: (1) paying $387.70 per month for 6 consecutive months beginning on November 1, 2023, for a total of $3,326.20 to pay his child support arrearage (in addition to his obligation to remain up to date on due and owing child support payments); (2) paying $4,685.03 to Sarah to reimburse her for mortgage payments and utility expenses he was obligated to pay but failed to pay; (3) establishing an account for the communication application within 14 days; (4) completing a 10-panel hair follicle test within 14 days; (5) depositing $1,300 into the marital account (otherwise it would be considered in the division of the parties' marital estate); and (6) abiding by the entire temporary order dated July 17, 2023 (i.e., his obligation to fully cooperate in the preparation and follow through to sell the marital residence; paying his share of the child's uninsured medical expenses, childcare expenses, and school expenses; and abiding by the mutual temporary restraining order as to property).

### 3. TRIAL

Trial began on November 28, 2023. Sarah appeared with counsel and Jacob appeared pro se. Jacob informed the district court that he "woke up sick," he had "COVID" before and it felt "similar," but he had not yet tested positive for it. Jacob indicated he wanted to "work out some

sort of settlement," that he was "okay" with vacating the parties' home, and that he wanted some time to see if an agreement could be reached. The court granted the parties a brief recess, following which they indicated no agreement was reached. After the first witness (Sarah) began to testify, Jacob stated he could not "focus," his "head [was] pounding," and he could not "see straight." The court continued trial to December 11 "based on [Jacob's] statements that [he was] sick and need[ed] to go the doctor." Additional details will be set forth as necessary later in our analysis.

Trial resumed on December 11, 2023, with Jacob again appearing pro se. Jacob stated, "I did want to go on the record to say I did try to hire an attorney. . . . [T]he two attorneys I met with couldn't do it unless I got another continuance." The district court inquired if Jacob was asking for a continuance; he responded, "Yes," "I just want to go on the record anyways." Sarah's counsel objected to a continuance. The court denied the motion to continue because Jacob had "ample opportunity" to get an attorney.

Sarah and Jacob then testified, and exhibits were received into evidence. The evidence relevant to the issues on appeal will be discussed as necessary later in our analysis.

### 4. DECREE

The district court entered its decree on January 8, 2024. The court awarded Sarah sole legal and physical custody of the parties' child, and Jacob's parenting time was to be at Sarah's discretion. Jacob was ordered to pay child support in the amount of $641 per month. Sarah was to pay the first $250 of "non-reimbursable" medical expenses on behalf of the minor child each year, with any excess expenses to be split equally between the parties. The parties were to each be responsible for 50 percent of work-related childcare expenses and school tuition incurred on behalf of the child.

Sarah was awarded the marital residence, but if she could not refinance it within 120 days, she was ordered to sell it. The parties' remaining assets and debts were distributed. Jacob was ordered to pay Sarah an equalization payment of $11,083 (this included $6,500 still due and owing from the contempt order, and $4,583 to equalize the distribution of the marital estate).

### 5. POST-DECREE MOTIONS AND ORDERS

Beginning on January 17, 2024, Jacob, through new counsel, filed various motions, including a motion to vacate and a motion for new trial. A hearing was held on March 6. On April 1, the district court entered an order amending the decree of dissolution and parenting plan. In the order, the court overruled Jacob's motion to vacate and motion for new trial. However, the court did amend the parenting plan to provide a more specific parenting time schedule.

Jacob appeals.

## III. ASSIGNMENTS OF ERROR

Jacob assigns that the district court erred in (1) failing to grant the motion to continue trial, motion for new trial, and motion to vacate and set aside the decree; (2) dividing the marital estate; and (3) calculating the child support award.

- 4 -

## IV. STANDARD OF REVIEW

Generally, a motion for a continuance is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion. *Weiss v. Weiss*, 260 Neb. 1015, 620 N.W.2d 744 (2001).

A motion for new trial is addressed to the discretion of the trial court, and the trial court's decision will be upheld unless it is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Sulzle v. Sulzle*, 318 Neb. 194, 14 N.W.3d 532 (2024).

The decision to vacate an order any time during the term in which the judgment is rendered is within the discretion of the court; such a decision will be reversed only if it is shown that the district court abused its discretion. *Kibler v. Kibler*, 287 Neb. 1027, 845 N.W.2d 585 (2014).

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## V. ANALYSIS

### 1. JACOB'S MOTIONS

Jacob argues that the district court abused its discretion in failing to award him a continuance, or in granting a new trial or vacating the decree.

### (a) General Propositions of Law

The three analytical factors to determine whether the trial court's denial of a motion for continuance was an abuse of discretion are (1) the number of continuances granted to the moving party, (2) the importance of the issue presented in the matter, and (3) whether the continuance being sought was for a frivolous reason or a dilatory motive. *Velehradsky v. Velehradsky*, 13 Neb. App. 27, 688 N.W.2d 626 (2004) (citing to *Weiss v. Weiss, supra*). We note that Neb. Rev. Stat. § 25-1148 (Reissue 2016) provides that an application for continuance must be made in writing and supported by affidavit. However, the failure to comply with the provisions of § 25-1148 is but a factor to be considered in determining whether a trial court abused its discretion in denying a continuance. *State v. Santos*, 238 Neb. 25, 468 N.W.2d 613 (1991).

Neb. Rev. Stat. § 25-1142 (Reissue 2016) provides the following grounds for a new trial: (1) irregularity in the proceedings of the court, jury, referee, or prevailing party or any order of the court or referee or abuse of discretion by which the party was prevented from having a fair trial; (2) misconduct of the jury or prevailing party; (3) accident or surprise, which ordinary prudence could not have guarded against; (4) excessive damages, appearing to have been given under the influence of passion or prejudice; (5) error in the assessment of the amount of recovery, whether too large or too small, if the action is upon a contract or for the injury or detention of property; (6) that the verdict, report, or decision is not sustained by sufficient evidence or is contrary to law; (7)

newly discovered evidence, material for the party applying, which the moving party could not, with reasonable diligence, have discovered and produced at the trial; and (8) error of law occurring at the trial and excepted to by the party making the application.

A court has inherent power to vacate or modify its own judgments at any time during the term at which those judgments are pronounced, and such power exists entirely independent of any statute. *Kibler v. Kibler*, 287 Neb. 1027, 845 N.W.2d 585 (2014). Douglas County is in the Fourth Judicial District. Under Rules of Dist. Ct. of Fourth Jud. Dist. 4-1 (rev. 2022), Jacob's January 17, 2024, motion to vacate was filed within the same term as the January 8 decree.

(b) Procedural History

On May 5, 2023, the matter came on for hearing on Sarah's motion for temporary orders. Sarah appeared with counsel and Jacob appeared pro se. Jacob informed the district court that he planned on hiring an attorney "when I leave here today" and asked that the hearing be continued; Jacob had already spoken to that attorney and provided the attorney's name to the court. The court granted the motion to continue, and the matter was continued to May 24. Counsel for Jacob entered her appearance on May 5. Following a hearing on May 24, the court entered its temporary order on July 17.

A "Proposed Scheduling Order" was entered August 24, 2023; it was agreed to by counsel for both parties on August 21 and was signed by the court on August 23. At the top of the scheduling order, it says "choose either A, B, or C." (Emphasis omitted.) However, both options "A" and "C" were completed. Option "A" states, "The parties have been unable to agree upon a Proposed Scheduling Order and are required to appear at a Scheduling Conference hearing which has been set for September 25, 2023[,] at 1:00 p.m." Option "B" states, "Trial Scheduled/Trial Held Date" followed by a blank line. Option "C" states, "The parties to this action have conferred and agree as follows," and it then goes on to set out deadlines for discovery, filing of motions, et cetera (e.g., fact discovery was to be completed on November 17; expert witnesses were to be designated by January 13, 2024, and "[a]ll discovery shall be completed on such expert witnesses" no later than March 14; dispositive pretrial motions were to be filed by March 3, and "non-dispositive" pretrial motions were to be filed no later than March 14). Option "C" also provided that the parties must be prepared for trial by no later than April 5, 2024.

Sarah filed an affidavit and application for an order to show cause on September 1, 2023, and the district court entered a show cause order on September 6, setting the matter for hearing on September 25. On September 7, Jacob's counsel filed a motion to withdraw, which the court granted on September 12.

On September 25, 2023, a status conference and show cause hearing was held. Sarah appeared with counsel. Jacob appeared pro se and requested "either some financial aid or time to get a new lawyer." He explained that he and his former attorney "didn't agree on a few things . . . and then it led to a communication breakdown." He said his former attorney claimed that she could not reach him by phone and that his phone "was shut off by Sarah." Over Sarah's objection, the district court continued the show cause hearing to October 11, but informed Jacob that if he appeared on that date without an attorney, "we're going to go forward."

The district court asked Sarah's counsel if she had any updates on the overall status of the case and what the next steps would be. Counsel stated that the parties had "been to mediation and agreed on a few things, including Catholic education and tuition, and that's about it." Counsel stated that Jacob had not complied with the terms of the temporary order to see the parties' child and had "not reached out in a couple months to see the minor child either." Counsel also stated that the "big issue" was that Jacob was not complying with the temporary order to pay the mortgage on the marital residence and to secure financing for the residence, and Sarah was "very interested in moving forward with putting the marital residence on the market, which would involve getting the keys from [Jacob] because he changed the locks." The court asked if it was counsel's assessment that, at this point, the case needed to be set for a trial; counsel responded in the affirmative. The court asked counsel when she would be able and ready to go to trial, and counsel responded, "[t]hirty days." The court then asked Jacob if he agreed that the case was ready to be set for trial, and Jacob responded, "I believe so." The court looked at trial dates and said, "Primary, I could do February 27th," and then it looked for an "earlier backup" date. The court asked if November 28 would work and Jacob replied, "If that's a reasonable amount of time for a new lawyer . . . that will work." The court informed the parties that they were set for a bench trial on November 28, and that they were "the first backup trial scheduled that day."

Following the hearing on September 25, 2023, the district court entered its "Order for Bench Trial (Domestic) First Back-Up," which included deadlines and other requirements for the written identification of witnesses and exhibits for trial, the submission of exhibits to the court reporter, the submission of a letter to the court identifying issues for trial, and a proposed decree. The order noted that if the trial was not heard on November 28, then it would be "[p]rimary on . . . February 27, 2024." (Emphasis omitted.)

The contempt hearing was held on October 11, 2023. According to the district court's October 16 order finding Jacob in contempt, Jacob had appeared pro se at the contempt hearing and "waived his right to counsel."

The marriage dissolution trial began on November 28, 2023. Sarah appeared with counsel and Jacob again appeared pro se. The district court asked if the parties were prepared for trial. Sarah's counsel replied in the affirmative. However, Jacob responded, "Not so much, but I am just hoping we could work out some sort of settlement just to move forward." He also informed the district court that he "woke up sick," he had "COVID" before and it felt "similar," but he had not yet tested positive for it. Jacob indicated he wanted to "work out some sort of settlement," that he was "okay" with vacating the parties' home, and that he wanted some time to see if an agreement could be reached. A brief recess was taken for the parties to determine if a settlement was possible. The settlement attempt was not successful, and the matter proceeded.

Sarah's counsel noted that Jacob had not complied with the order for bench trial because he had not provided witnesses or exhibit lists and copies of the exhibits prior to trial, had not had the court reporter mark his exhibits (which counsel had not seen), had not submitted a letter to the district court identifying the issues for trial, and had not submitted a proposed decree. Jacob acknowledged that counsel was "correct about that," and cited his "inexperience and knowledge of the system." The court stated the exhibits would be addressed as they came up in trial.

Shortly after Sarah began testifying, Jacob informed the district court that he "can't even focus right now" and was not feeling well. He said he wanted "to continue, I guess, and get this over with so I can go to the doctor." Sarah's counsel was concerned that Jacob was malingering, or that it had to do with his drug use, or that he was "shocked that we have all this evidence setting up to prove our case." Sarah's counsel noted that Jacob had "months to retain a new attorney." When the court asked Jacob if he had taken any steps to find a lawyer or if he had decided that his best choice was to represent himself, he responded, "I have set up appointments to talk to another attorney" and "I got a . . . check yesterday . . . that would allow me . . . enough funds to acquire an attorney." Jacob denied that he was "coming down from drugs" and stated that he was "just not feeling well." Although Sarah asked the court "that we move forward," the court continued trial to December 11 "based on [Jacob's] statements that [he was] sick and need[ed] to go the doctor." The court informed Jacob that it expected "information from the doctor indicating that you visited them today."

When trial resumed on December 11, 2023, Jacob provided an exhibit showing that he saw an "APRN" at an urgent care facility on November 28, 2023. The exhibit was a "Statement of Physician" and appeared to be a form from the Nebraska Department of Motor Vehicles; there was some discussion on the record about whether Jacob was seen because he was ill or because he needed a form stating that he could operate a motor vehicle. The district court inquired if everyone was prepared for trial. Sarah's counsel answered in the affirmative. However, Jacob stated, "Yeah, . . . however, I did want to go on the record to say I did try to hire an attorney. . . . [T]he two attorneys I met with couldn't do it unless I got another continuance." The district court asked if Jacob was requesting a continuance; he responded, "Yes," "I just want to go on the record anyways." Sarah's counsel objected to a continuance, stating that "the November 28th date had been set for months, and [Jacob] failed to retain counsel. And then, you know, he managed to get the trial continued." The court overruled the motion to continue stating, "This matter was originally set for trial November 28th. A continuance was granted on that date. In prior hearings before the 28th of November [Jacob] had stated he was going to get an attorney, potentially, and had ample opportunity to do so." The trial proceeded and the matter was taken under advisement by the court at the end of the day.

The decree was entered on January 8, 2024. On January 17, Jacob's current counsel entered his appearance and filed a motion to vacate and a motion for new trial.

The motion to vacate and motion for new trial were addressed at a hearing on March 6, 2024, and numerous exhibits were received into evidence. Jacob's counsel stated that relevant to the district court's consideration was a scheduling order entered August 24, 2023. As set forth previously, the scheduling order set certain deadlines, including that the parties should complete fact discovery by November 17, 2023, and be prepared for trial no later than April 5, 2024. Current counsel noted that Jacob had an attorney at the time the parties agreed to the scheduling order, but that attorney subsequently withdrew. The court "then set a trial date five months ahead of [the date set in the scheduling order]." Counsel pointed out that the court did ask Jacob if a November 28, 2023, trial date would work, and that Jacob's response was that it would work if that was a reasonable time to hire a new attorney. Counsel argued, "[Jacob] obviously had no idea the effect of having a trial date would have on his ability to hire an attorney, but he made efforts to do so."

Jacob's counsel argued that Jacob tried to hire an attorney, and he "did meet with me on December 4th." "You can see in his affidavit that I attempted to work out a continuance. I informally e-mailed your bailiff about it asking if you'd push it out because I couldn't be prepared for trial just a few days later, and that was denied." "[Y]ou had indicated through your bailiff that only if it was by agreement," and opposing counsel "was unwilling to allow [Jacob] time to hire an attorney." Counsel did file an appearance shortly after the decree was entered and hoped that showed that "[Jacob's] intentions to hire me were honest."

Jacob's counsel argued, "I do think that the decree needs to be vacated in equity or under [§] 25-1142, due to this quirk of scheduling the -- having the trial happening five months before, you know, it -- it should have happened under the -- under the terms of the scheduling order." "[A]nd ultimately, Judge, a full presentation of evidence after discovery with an attorney on his side I think is what needs to happen here."

In response, Sarah's counsel noted that Jacob had received continuances despite not filing any written motions to continue, as required by statute. Counsel also noted that Jacob's current counsel could have filed a limited appearance during the case and moved for a continuance, but that did not occur. Sarah's counsel argued that "the gravamen of [Jacob's] motions is that he did not have the assistance of counsel and, therefore, there was a breakdown in the presentation of evidence." Jacob "essentially asks the court to give him a do-over," but does not cite any irregularity or prejudice occurring in the proceeding attributable to Sarah or the court.

The district court overruled Jacob's motion to vacate and his motion for new trial. The court stated:

> The Court determined the merits of the case based on the information and evidence presented to the Court at the time of trial. [Jacob] was given multiple opportunities throughout the pendency of the case to retain counsel and failed to do so prior to trial. [Jacob's] last minute purported oral motion to continue did not comply with Nebraska Revised Statutes or court rules.
>
> The Court finds that there was no irregularity in the proceedings of the Court preventing [Jacob] from having a fair trial, there was no misconduct of the prevailing party, and there was no error in the assessment of the amount of recovery as required to grant a new trial pursuant to . . . §25-1142. Further, the action is not upon a contract or for the injury or detention of property pursuant to . . . §25-1142(5), and, accordingly, that particular section does not apply.

### (c) District Court Did Not Abuse Its Discretion

#### (i) Motion to Continue

On appeal, Jacob states that the parties were originally to be prepared for trial by April 5, 2024, but trial was later set for November 28, 2023, and ultimately continued to December 11. He argues that "[h]aving the truncated timeline made finding an attorney next to impossible for [him], with each attorney he spoke to saying they would need a continuance." Brief for appellant at 19. Jacob "had only requested a single continuance before making his continuance on December 11 . . . to hire the attorney that had emailed the Court indicating that he would enter an appearance if

a continuance could be worked out." *Id.* at 22. He contends the continuance "was not brought for frivolous or dilatory motives," but was for Jacob "to have the assistance of an attorney with the most important aspect of his life." *Id.*

He cites us to *Weiss v. Weiss*, 260 Neb. 1015, 620 N.W.2d 744 (2001), regarding the continuance. In *Weiss*, the Nebraska Supreme Court found that the district court erred in denying the husband's pro se motion for a continuance filed 10 days after his attorney was given leave to withdraw from the case and 16 days prior to the commencement of trial. The husband had filed a written motion for continuance outlining his efforts to retain new counsel. The Supreme Court noted that it was the husband's first motion to continue, his pro se motion for continuance was in substantial compliance with § 25-1148, the trial involved a constitutionally protected relationship between parent and child, and there appeared to be no intent on the husband's part to unnecessarily delay the proceedings.

Sarah claims that "[t]he present case is easily distinguished from *Weiss*." Brief for appellee at 20. She notes that contrary to Jacob's assertion that he had only been granted one continuance during the divorce proceeding, "the record shows that the trial court granted [him] three continuances." *Id*. Additionally, Jacob did not file a written motion to continue trial, and did not orally move for a continuance until after the trial started.

We agree with the district court that Jacob had been given "ample opportunity" to retain counsel during the pendency of the proceedings, but that he failed to do so. There was a "Proposed Scheduling Order" entered on August 24, 2023 (signed by counsel for both parties and the district court) that included options for the parties to either appear at a scheduling conference on September 25, or to be prepared for trial no later than April 4, 2024 (with specified timelines for discovery and pretrial motions.) Notably, discovery was to be completed by November 17; later deadlines were provided for discovery related to expert witnesses, but there is nothing to indicate that either party needed an expert witness for the limited matters at issue in this case.

After the proposed scheduling order was filed, Jacob's former counsel filed to withdraw on September 12, 2023. The show cause hearing on Sarah's contempt action was scheduled for September 25. On that day, Jacob appeared pro se and requested a continuance to allow him time to obtain new counsel. Over Sarah's objection, the district court continued the contempt hearing to October 11 but cautioned Jacob that if he appeared without an attorney on that date, they would be moving forward. Additionally, at the hearing on September 25, the court received a status update on the case from Sarah's counsel indicating agreement by the parties on a "few things," but also pointing out issues related to Jacob's noncompliance with the temporary order. The court asked if it was counsel's assessment that, at this point, the case needed to be set for a trial; counsel responded in the affirmative. The court asked counsel when she would be able and ready to go to trial, and counsel responded, "[t]hirty days." The court then asked Jacob if he agreed that the case was ready to be set for trial, and Jacob responded, "I believe so." When asked if November 28 would work, Jacob replied, "If that's a reasonable amount of time for a new lawyer . . . that will work." At the hearing and in an order entered the same day, the court made the parties aware that trial would be scheduled for November 28 as the "first back-up" case. At that point, there were 2 full months available for Jacob to obtain counsel and complete discovery by November 17. That

was certainly a reasonable amount of time for Jacob to obtain counsel, even if for the limited purpose of entering an appearance to request a continuance.

Notably, at the October 11, 2023, contempt hearing, despite his prior request for a continuance to obtain an attorney for that hearing, Jacob still appeared pro se. There is nothing in the record to indicate that Jacob had made any effort to acquire new counsel by that time. And when trial started more than a month later on November 28, he still had no attorney. At that time, he sought to continue matters because he claimed he was not feeling well. The district court granted his request and continued trial to December 11. When trial resumed, Jacob still appeared without counsel and indicated he could not hire someone "unless [he] got another continuance."

It was not unreasonable for the district court to deny any further continuances when as early as September 25, 2023, Jacob indicated he was seeking an attorney, and yet by December 11, he was still without counsel. Jacob specifically requested a continuance on September 25 so that he could obtain an attorney for the October 11 hearing; he appeared with no attorney. He also agreed that the case was ready to be set for trial and he did not object to a trial date of November 28; he again appeared without an attorney. Jacob failed to retain counsel for over 2 months despite saying he intended to do so.

Further, although the proposed scheduling order indicated that the parties "must be prepared for trial by not later than April 5, 2024," that did not preclude scheduling trial sooner. The deadline for discovery had passed and the district court was faced with a party who was not complying with the temporary order, including not paying child support, not paying the mortgage on the family home, not submitting to a drug test, and not paying various expenses related to the child. And although not by itself dispositive, we observe that no written application for a continuance, supported by an affidavit, was ever filed pursuant to § 25-1148. Under these circumstances, we cannot say that the district court abused its discretion by denying Jacob's request to continue when trial resumed on December 11.

### (ii) Motions for New Trial and to Vacate

As for the motion for new trial, Jacob claims that the "relevant terms here are [§ 25-1142](1) irregularity in the proceedings, (2) misconduct of the prevailing party, and (5) error in the assessment of judgment." Brief for appellant at 25. He also claims that the district court could have vacated the decree.

Jacob once again focuses on the fact that the parties originally were to be prepared for trial by April 2024, but the trial was later set for November 28, 2023, and continued to December 11, at which time the district court denied him another continuance. He then claims that due to the lack of preparation by both parties, the court was presented with insufficient evidence, "that did not include fundamental evidence that is required by Court rule (taxes and pay stubs), [and] exclude[ed] evidence of assets such as [Sarah's] own 401(k) and bank statement." Brief for appellant at 26-27.

As to Jacob's claim that the lack of preparation by both parties led to the district court being presented with insufficient evidence, we note that there is nothing in our record to show what, if any, discovery was conducted in this case prior to trial (e.g., requests for interrogatories, requests for production of documents, depositions of witnesses) either before Jacob's former counsel

withdrew in September 2023, or after, when Jacob was pro se. And Jacob never raised a discovery issue during his requests to continue trial. It is true that the parties' tax returns and pay stubs were not offered into evidence at trial, but the parties did testify about their respective incomes. Jacob asked Sarah if she had a 401(k), and she said that she did. He then asked if there was a reason she "didn't list that," and she responded that it was premarital, and it was the same 401(k) she had when she started her job 9½ years ago. Jacob did not ask Sarah any further questions about her 401(k), including its value. Jacob did not ask Sarah any questions about her bank account(s) or the value thereof. During his testimony Jacob testified that Sarah's bank account(s) "are similar to mine." Jacob "imagine[d]" that Sarah's 401(k) and her bank account(s) "equal somewhere around this equalization payment of $76,000" owed by him in Sarah's proposed division of marital property. The district court's handling of Sarah's 401(k) and bank account(s) in the division of the marital estate will be discussed later in this opinion.

We have already determined that Jacob had ample opportunity to retain counsel but failed to do so, and that the district court did not abuse its discretion by denying a further continuance. Further, Jacob did not object at trial to any alleged irregularity in the proceedings (§ 25-1142(1)) or misconduct by Sarah (§ 25-1142(2)). See *Smith v. Colorado Organ Recovery Sys.*, 269 Neb. 578, 694 N.W.2d 610 (2005) (it is not abuse of discretion to overrule motion for new trial that is based on errors alleged to have occurred during trial, but to which no timely objection was made). Section 25-1142(5) provides grounds for a new trial when "there is error in the assessment of the amount of recovery, whether too large or too small, if the action is upon a contract or for the injury or detention of property." As noted by the district court, this action is not upon a contract or for the injury or detention of property, thus § 25-1142(5) does not apply. We conclude that the district court did not abuse its discretion in denying Jacob's motion for new trial or to vacate.

### 2. DIVISION OF MARITAL ESTATE

Jacob claims that the district court abused its discretion in the division of the marital estate. More specifically, he argues that the court abused its discretion by not ordering the parties' marital home sold with the proceeds divided, by not dividing Sarah's retirement account, and by not accounting for Sarah's bank accounts.

### (a) General Propositions of Law

Neb. Rev. Stat. § 42-365 (Reissue 2016) authorizes a trial court to equitably distribute the marital estate according to what is fair and reasonable under the circumstances. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). In a marital dissolution action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Id.* There is no mathematical formula by which property awards can be precisely determined, but as a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Id.*

In a marital dissolution action, the equitable division of property is a three-step process. The first step is to classify the parties' property as either marital or nonmarital, setting aside the nonmarital property or nonmarital portion of the property to the party who brought the property to

- 12 -

the marriage. The second step is to value the marital assets and marital liabilities of the parties. And the third step is to calculate and divide the net marital estate equitably between the parties. *Id.*

Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016).

### (b) Marital Home

At trial, Sarah presented exhibit 26, a property record from Douglas County, showing that the marital residence was assessed at $369,100 for 2023. Sarah testified that exhibit 27 was the parties' closing disclosure statement dated November 29, 2021, showing that the purchase price of the home was $360,000, with a loan amount of $310,000. She confirmed that the parties made a down payment of approximately $50,000 on the marital residence. She said that she contributed "right around [$]42,000" that came from premarital proceeds from the sale of her condo, and Jacob contributed approximately $10,000. Sarah believed that the outstanding balance on the mortgage was approximately $299,000. She requested that the district court award her the marital residence and that in the event she decided to sell the property in the future, that Jacob not be entitled to any proceeds from the sale.

Jacob believed the house had a value of $400,000 based on "[t]he MLS and . . . Zillow," and said the mortgage balance was $297,000. When asked if he would have a problem with the district court granting Sarah ownership and possession of the residence and her listing it alone, Jacob replied, "Yes," "[b]ecause I have put in a lot of money into that house, probably a lot more than she has, and I have put in a lot more labor into that."

The district court found that "[t]here was some testimony from [Sarah] regarding her portion of the down payment being premarital, but there was no certainty as to the amount and no documentary evidence tracking this as premarital property," therefore, the evidence was "too vague" to rely on in distributing the marital residence. The court awarded Sarah the marital residence. "Should Sarah be unable to refinance or otherwise take actions to remove [Jacob] from the mortgage, [Sarah] shall sell the home with all proceeds being awarded to [her]"; "[a]ny claim by [Jacob] to the equity in the marital home has been taken into consideration in the final property division and equalization payment as spelled out . . . in Exhibit C, the Court's Distribution Chart." In its distribution chart, the court valued the marital residence at $369,100, with an encumbrance of $297,000, and an equity value of $72,100.

Jacob claims that "it was an abuse of discretion for the trial judge not to stay with the temporary orders for the home to be sold to establish its value and order that the proceeds simply be divided evenly between the parties." Brief for appellant at 29. Alternatively, he argues that the district court should have "averaged the estimate of each party, which would have resulted in a valuation of $384,550." *Id.* at 30.

Jacob was initially granted possession of the home with an option to obtain an appraisal and refinance the mortgage, or otherwise sell the home; however, he failed to pay the mortgage and expenses associated with it. At the time of the show cause hearing in October 2023, Sarah had paid $4,302.54 on the house mortgage to keep it out of foreclosure. Jacob had also failed to cooperate in getting the house placed on the market for sale. Ultimately, Jacob vacated the property in December and Sarah took possession. Although the district court awarded Sarah the home, she

- 13 -

was required to refinance the mortgage within 120 days to remove Jacob from any liability associated with the property. If she was unable to do so, she was ordered to sell the home. Since the home was now in Sarah's possession, it was not unreasonable for the court to leave Sarah the option of refinancing the mortgage or selling the home.

Also, as to Jacob receiving his fair share of the equity in the home, we see no abuse of discretion. The district court elected not to set aside any of Sarah's or Jacob's claimed premarital interest in the home, and all equity in the home was included in the marital estate. There was evidence to support the values used by the court for both the home and the mortgage.

We cannot say that the district court abused its discretion regarding the value of the residence, its decision to award it to Sarah, or its determination that any claim by Jacob to equity in the residence was taken into consideration in the final property division and equalization payment.

(c) Sarah's Retirement Account and Bank Account(s)

Sarah provided bank statements for Jacob's personal checking and savings accounts (exhibit 39) and valued them at $80,934 as of the date she filed the complaint for dissolution. Jacob agreed that his bank account balances had decreased since the complaint was filed, and said he spent the money on a lawyer for a business lawsuit, his former lawyer in the divorce case, a new motor in one of his vehicles, and some mortgage payments. Jacob stated that the current balance of his bank accounts was "about [$]20,000 at the most." He said, "Sarah's checking and savings account, which are similar to mine" are not listed on her proposed division of marital property; "her 401(k) is not listed on here as well."

Sarah provided no testimony or evidence regarding her bank account(s). She testified that she had a 401(k) that was premarital; "It's been my same 401(k) since I have had my job nine-and-a-half years ago when I started it." She also confirmed that retirement was automatically taken out of her check, and that it was reflected in her proposed child support calculation; her child support calculation shows "Retirement" of $260 per month.

Because it is relevant to how the district court dealt with Sarah's bank accounts and 401(k), we note that there was also testimony at trial regarding a 2008 Toyota Tundra. Sarah testified that the Tundra was Jacob's personal vehicle; she valued the vehicle at $15,000 after she "looked it up online through a Google search." Jacob testified that "Toyota Tundra Blue Books at $4500." In its decree, the court awarded the 2008 Toyota Tundra to Jacob. The court stated,

> In the distribution of the marital property, there is no value attributed to this vehicle as there was no credible evidence presented for the Court to rely on in assessing its value. Furthermore, the Court is aware that [Sarah] has been awarded a bank account and 401k for which no value was provided. The Court . . . considers this to be a balanced way to distribute these assets as there is no evidence to rely on for any of these items.

Jacob argues there was "absolutely no question that Sarah has a 401(k) through her work that should have been accounted for by the trial court." Brief for appellant at 30. He noted that "Sarah admitted in her proposal for child support that she had $260 per month, each month deposited in the account." *Id.* Jacob contends that "because it is an employer sponsored 401(k) the

- 14 -

Court had the authority to direct the parties to prepare a Qualified Domestic Relation Order and award [him] one-half of the value accrued between [t]he date of the marriage, October 21st, 2021, and the date of the filing of the action April 17th, 2023." *Id.* Alternatively, "the Court could have taken the $260 per month contribution testified to by Sarah, and multiplied it by 17 months to arrive at the deposits to her account during the marriage of $4,420." *Id.*

Jacob also argues that the district court assigned no value to Sarah's checking and savings accounts. "It should be clear to this Court by now that Sarah did not present all of her assets to the trial court, and yet in computing the equalization payment, the trial court made a to the dollar equalization." *Id.* "The trial court should have recognized that Sarah obviously had other assets that she was failing to disclose and indicated that under the equities of this case neither party should be ordered to pay an equalization to the other and that it was within the 2/3 – 1/3 equitable division of the estate." *Id.* at 30-31.

In response, Sarah argues that the district court acknowledged the lack of credible evidence to assess the value of certain marital property, but in equitably dividing the net marital estate it "awarded each spouse close to one-half of the marital estate and ordered [Jacob] to make a modest equalization payment in addition to the amount [he] still owed [Sarah] per the contempt order." Brief for appellee at 27.

We find that the district court did the best it could with the limited evidence provided by the parties, and we find no abuse of discretion in its balancing Sarah's bank account(s) and the marital portion of her 401(k) awarded to her against the Tundra awarded to Jacob. We agree with Sarah that based on the evidence presented, the court's overall valuation and division of the marital estate was fair and reasonable.

### 3. CHILD SUPPORT

Jacob claims that the district court erred in computing his income for child support purposes.

At trial, Sarah testified that at the time she filed the complaint for dissolution, she was earning $68,000 per year. Exhibit 24 was Sarah's proposed child support calculation, attributing a gross income of $6,500 per month ($78,000 per year) to her and $5,833 per month ($69,996 per year) to Jacob; according to that calculation, Jacob should pay child support in the amount of $641 per month.

Jacob testified that he earned $75,000 in 2021; he did not state the source of that income. As for his income in 2022, Jacob said, "that was my first year"--he started a business in June 2021--"[a]nd I still need to file my taxes," "but as of now I had a profit of $4,000," "[a]nd then I think I had $10,000 W-2 wages on 2022." For 2023, "I need yet to do my taxes, but I am at $33,000 profit" and "don't have any other income that I can think of."

In its decree, the district court ordered Jacob to pay child support in the amount of $641 per month. The child support calculation was

> based on the evidence presented to the Court regarding [Sarah's] income of $68,000 per year and the only credible evidence of [Jacob's] income indicating that prior to owning his own business, [Jacob's] income was $75,000 per year. The Court finds that [Jacob] is

capable of earning at least that amount per year based on the evidence presented. He has no disabilities regarding his ability to work and earn.

Despite the court's references to the incomes stated above, we note that the child support calculation ultimately used by the court was Sarah's proposed calculation (exhibit 24). That exhibit attributed a gross income of $6,500 per month ($78,000 per year) to Sarah and $5,833 per month ($69,996 per year) to Jacob. The court ordered the parties to alternate the right to claim the minor child for tax exemption purposes; Jacob's right to claim any exemption was contingent upon his being current in his child support obligation. Sarah was to pay the first $250 of "non-reimbursable" medical expenses on behalf of the minor child each year, with any excess expenses to be split equally between the parties. The parties were to each be responsible for 50 percent of work-related childcare expenses and school tuition incurred on behalf of the child.

Jacob claims that the "only actual evidence of [his] income for 2023 was that he earned $33,000 as a self[-]employed person," and "[t]hat is equal to $2,750 per month." Brief for appellant at 31. That, "and dividing the tax exemption for the child as was ordered in the Decree, indicates that [Jacob] should have been ordered to pay Sarah $358 per month, not $641 per month." *Id.* at 31-32. Additionally, he argues that based on his child support calculation he should only be responsible for 33 percent of the childcare expenses and the unreimbursed medical expenses.

Neb. Ct. R. § 4-204(E) (rev. 2020) states:

> If applicable, earning capacity may be considered in lieu of a parent's actual, present income. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources. When imputing income to a parent, the court shall take into consideration the specific circumstances of the parents, to the extent known. Those factors may include the parent's residence, employment and earnings history, job skills, educational attainment, literacy, age, health, and employment barriers, including criminal record, record of seeking work, prevailing local earning levels, and availability of employment.

Use of earning capacity to calculate child support is useful when it appears that the parent is capable of earning more income than is presently being earned. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013).

Here, the parties presented no evidence besides their own testimony as to their incomes. The district court found that "the only credible evidence of [Jacob's] income" was that prior to owning his own business he earned $75,000 per year, and that he was capable of earning at least that amount per year. Although the court referenced Jacob having income of $75,000, when calculating child support, it attributed a lesser income of $69,996 per year to Jacob, while attributing a higher income of $78,000 per year to Sarah. We find no abuse of discretion in the court's determination of Jacob's income, or in its finding that Jacob's child support obligation was $641 per month.

We do however modify Jacob's obligation regarding the childcare expenses and the child's nonreimbursed health care expenses to be in accord with the Nebraska Child Support Guidelines. See, Neb. Ct. R. §§ 4-214 (rev. 2016) (childcare expenses shall not exceed proportion of obligor's

parental contribution from worksheet 1, line 6); Neb. Ct. R. § 4-215 (rev. 2020) (all nonreimbursed reasonable and necessary children's health care costs in excess of $250 per child per year shall be allocated to obligor parent as determined by court, but shall not exceed proportion of obligor's parental contribution from worksheet 1, line 6). Jacob's parental contribution from worksheet 1, line 6, was 47 percent.

Accordingly, we modify the decree so that Sarah shall be responsible for 53 percent and Jacob shall be responsible for 47 percent of work-related childcare expenses. And after Sarah pays the first $250 of "non-reimbursable" medical expenses on behalf of the minor child each year, she shall be responsible for 53 percent and Jacob shall be responsible for 47 percent of any remaining nonreimbursed health care expenses.

## VI. CONCLUSION

For the reasons stated above, we affirm as modified the district court's January 8, 2024, decree, as amended on April 1.

AFFIRMED AS MODIFIED.